**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Community Eco Power, LLC, *et al.*,[1] | Case No. 21-30234 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF RICHARD FISH IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Richard Fish, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the President and Chief Executive Officer ("President & CEO") of Community Eco Power, LLC ("CE Power"), Community Eco Springfield, LLC ("CE Springfield"), and Community Eco Pittsfield, LLC ("CE Pittsfield" and, together with CE Power and CE Springfield, the "Debtors").

2.      I have nearly 40 years of experience in energy, financial, waste management, and other related industries, including an extensive background in renewable energy that has included roles in operations, finance, and executive-level positions.

3.      I have been the Debtors' President & CEO since March 2019.  I am familiar with the Debtors' day-to-day operations, businesses, debt structure, and financial affairs.  I am authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the First Day Motions (as defined below), as well as other pleadings that may be filed in the cases.  All facts set forth herein are based on my personal knowledge, on information supplied to me by

---

[1] The last four digits of Community Eco Power, LLC's federal taxpayer identification number are 5513.  See 11 U.S.C. § 342(c)(1).  The last four digits of Community Eco Springfield, LLC's federal taxpayer identification number are 4363.  See id.  The last four digits of Community Eco Pittsfield, LLC's federal taxpayer identification number are 8358.  See id.  The principal place of business for the Debtors is 500 Hubbard Avenue, Pittsfield, Massachusetts 01201, and the Debtors' mailing address is P.O. Box 510, Amesbury, Massachusetts 01913.

others within the Debtors' organizations, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition, and present liquidity needs.  If I were called to testify, I could and would testify competently to the facts set forth herein.

4.      On June 25, 2021 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") to commence the above-captioned chapter 11 cases.  To familiarize the Bankruptcy Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

Part I provides a general overview of the Debtors' history and operations;

Part II provides an overview of the Debtors' prepetition debt structure;

Part III describes the circumstances leading to these chapter 11 cases; and

Part IV sets forth the factual bases for the relief requested in each of the First Day Motions.

I.      **General Overview of the Debtors' History and Operations**

5.      CE Power is a limited liability company formed under the laws of the State of Delaware.

6.      CE Springfield and CE Pittsfield are limited liability companies formed under the laws of the state of New York.

7.      The Debtors' principal places of business are located at 500 Hubbard Avenue, Pittsfield, Massachusetts 01201, and their mailing address is P.O. Box 510, Amesbury, Massachusetts 01913.

8.      The last four digits of CE Power's federal taxpayer identification number are 5513.  The last four digits of CE Springfield's federal taxpayer identification number are 4363. The last four digits of CE Pittsfield's federal taxpayer identification number are 8358.

9.      The Debtors were established when, in May 2019, the Debtors acquired existing waste-to-energy facilities located in Pittsfield and Agawam, Massachusetts, from Covanta, a publicly traded company and leader in providing sustainable waste solutions for its customers, primarily via energy-from-waste services.  The Agawam and Pittsfield facilities were each acquired by CE Springfield and CE Pittsfield, respectively. CE Power owns and controls CE Springfield and CE Pittsfield indirectly, through an intermediary holding company, Community Western Massachusetts, LLC, in which CE Power is the sole member, and which is not presently a debtor in a chapter 11 case.

10.      The opportunity to acquire the Agawam and Pittsfield facilities presented itself when Covanta conducted a strategic review of its then-existing assets and determined the Agawam and Pittsfield facilities to be "non-core" assets fit for divestiture.  The acquisition of the Agawam and Pittsfield facilities complimented a business plan developed by the Debtors' members and executive leadership, which sought to acquire older waste-to-energy facilities that still had significant remaining useful life, long histories in their host communities, provide significant employment with above-average wages, and have upside potential that the Debtors could realize through a "boots on the ground" leadership model—with experienced industry professionals handling day-to-day challenges and focused on leveraging internal resources to maximize returns.

11.    The Pittsfield and Agawam facilities have operated since the 1980s and together are designed to process approximately 650 tons per day[2] of municipal solid waste ("MSW"), primarily generated by residential and commercial sources located within a 35-mile radius of each plant. The facilities have municipal, local, and national blue-chip customers that aggregate and transport waste to the Debtors' plants, where it is combusted to produce steam and electricity that is either used to power the operations of each facility, sold directly to existing customers, or indirectly to customers through the Northeast U.S. electric grid.  The acquisition of the Pittsfield and Springfield facilities included all property, plant, and equipment, consisting of real property of land, buildings, site improvements, machinery, and equipment.

12.    For the 2021 calendar year, the Debtors project that they will process 80,000 and 124,000 tons of MSW, respectively, at their Pittsfield and Agawam facilities, which is below the overall permitted capacity of 84,000 and 131,000 at these facilities.  Both Pittsfield and Agawam are permitted to process MSW, which is defined as ordinary household or commercial waste and/or nonhazardous pharmaceuticals.  "Tipping fees," or fees paid per ton of MSW disposed of at a facility, are the Debtors' most significant source of revenue, representing approximately 71% of total revenue.  Other sources of revenue include the sale of electricity to the grid, the sale of steam from the Pittsfield facility under fixed-rate contracts, and other ancillary revenue streams.  Some of the Debtors significant customers include Waste Management, Inc., Casella Waste Systems, USA Waste, Crane Company, and various municipalities in western Massachusetts.

13.    I am the President and CEO of the Debtors, and I also am an owner of CE Power and indirect owner of the other Debtors.  Kevin M. Bolin is also an owner of CE Power, and he serves as Chairman of CE Power, while also providing various consulting services to the Debtors

---

[2] 240 tons per day at the Pittsfield facility and 408 tons/day at the Agawam facility.

pursuant to a consulting agreement. David M. Beavens serves as Chief Financial Officer of the Debtors, and he has over 40 years of experience in financial leadership, including prior experience as a CFO and COO of a waste-to-energy company in Michigan. Linwood Bubar serves as the Chief Operating Officer and has over 40 years of experience in the operation, engineering, and construction of residuals processing and energy production facilities. Additional leadership positions for the Debtors include a VP of Operations, a Controller, and information technology and human resources managers.

## II.   Overview of Debtors' Prepetition Debt Structure

14.   Prior to the Petition Date, the Debtors engaged in various transactions with multiple parties that resulted in the Debtors incurring certain debt obligations and granting liens on certain of the Debtors' assets to secure those obligations. Those obligations and liens are summarized next.

### A.   Prepetition Secured Creditors

15.   **Alterna Capital Solutions, LLC.**   On or about August 19, 2020, the Debtors entered into that certain Invoice Purchase and Security Agreement (the "Alterna Agreement") with Alterna Capital Solutions, LLC ("Alterna"). As of June 18, 2021, the amount of debt owed to Alterna was approximately **$1,100,000.00** (subject to daily fluctuations). In order to secure the Debtors' obligations to Alterna under the Alterna Agreement, the Debtors granted Alterna security interests in all or substantially all of the Debtors' personal property, including cash collateral. On August 17, 2020, Alterna filed: UCC Financing Statement 20205673829 with the Delaware Secretary of State (as to CE Power); UCC Financing Statement 202008177373366 with the New York Secretary of State (as to CE Pittsfield); and UCC Financing Statement 202008177373378 with the New York Secretary of State (as to CE Springfield).

16.     **SDI, Inc.**  On or about August 31, 2020, the Debtors entered into that certain Note and Security Agreement (the "SDI Agreement") with SDI, Inc. ("SDI").   The SDI Agreement constitutes a resolution regarding CE Power's indebtedness to SDI under that certain MRO Services Agreement.  Pursuant to the SDI Agreement, the Debtors were indebted to SDI in the original principal amount of **$5,540,000.00**.  The Debtors also granted SDI security interests in all or substantially all of the Debtors' personal property, including cash collateral.  On August 31, 2020, SDI filed: UCC Financing Statement 20206006508 with the Delaware Secretary of State (as to CE Power); UCC Financing Statement 202008317496316 with the New York Secretary of State (as to CE Pittsfield); and UCC Financing Statement 202008317496328 with the New York Secretary of State (as to CE Springfield).

### B.     Paycheck Protection Program

17.     Pursuant to the Paycheck Protection Program (the "PPP"), the Debtors received a "Round 1" PPP loan that has been fully forgiven under applicable rules and regulations.  The Debtors also received approximately **$1,340,000.00** in funding through a Promissory Note and Loan Agreement with Berkshire Bank that was guaranteed by the Small Business Administration through PPP "Round 2."  Forgiveness of the second PPP loan is contingent on CE Power's use of the funds for certain specified costs, including payroll and utility payments.  Although the Debtors believe that the Round 2 loan will be forgiven in full, that determination has not been made as of the Petition Date, resulting in a contingent liability.

## III.     Circumstances Leading Up to the Chapter 11 Filing

18.     Prior to the Petition Date, the Debtors diligently explored a range of options to address their ongoing challenges related to maintaining sufficient cash flow to satisfy their debt and operational obligations.  Ultimately, due to cash flow concerns and ongoing disputes with certain secured and trade creditors that threatened continued operations, the Debtors, together

with their advisors, determined to commence these chapter 11 cases to stabilize the Debtors' balance sheets and optimize the value of their estates for the benefit of all parties in interest through a chapter 11 debt restructuring or potential asset sale.

## IV.    **First Day Motions**[3]

19.    The Debtors have filed or expect to file a number of motions (collectively, the "First Day Motions") seeking orders granting various forms of relief, including certain relief on an emergency basis.  I have reviewed the First Day Motions, including exhibits, and I believe that the relief sought in the First Day Motions is necessary to stabilize the Debtors' businesses, facilitate the efficient administration of the chapter 11 cases, lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations and employees, and facilitate a successful reorganization of the Debtors.  I believe that the relief requested in the First Day Motions is critical to avoiding imminent and irreparable harm in the early stages of these cases to the Debtors, their estates, and critical stakeholders, including customers, creditors, and employees, and to maximize the value of their assets for the benefit of all stakeholders.

### A.    MOTION OF DEBTORS FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES AND RELATED RELIEF (the "**Joint Administration Motion**")

20.    I understand that the Debtors are requesting that their chapter 11 cases be jointly administered for procedural purposes only.  I believe that joint administration of the chapter 11 cases will promote fair and efficient administration of these chapter 11 cases and will ease the administrative burden on this Court and all parties in interest.  Because the Debtors' management, financial affairs, and operations are closely related, I anticipate that many of the motions, hearings, and orders in the bankruptcy proceedings will affect all the Debtors.  Joint

---

[3] Capitalized terms used but not defined in this First Day Motions section of this Declaration shall have the meaning ascribed to such terms in the respective First Day Motion.

administration will also reduce the volume of paper that otherwise would be filed with the Clerk of the Court because it will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders.

21.     I believe that parties in interest will not be harmed by the relief requested in the Joint Administration Motion.  Rather, I believe that parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

**B.     MOTION OF DEBTORS FOR THE ENTRY OF AN ORDER: (I) AUTHORIZING THE DEBTORS TO MAINTAIN A SINGLE CONSOLIDATED CREDITORS' MATRIX, IN LIEU OF MAINTAINING A SEPARATE CREDITORS' MATRIX FOR EACH DEBTOR; AND (II) AUTHORIZING THE DEBTORS TO FILE THE CONSOLIDATED TOP 30 UNSECURED CREDITORS LIST, IN LIEU OF FILING A TOP 20 UNSECURED CREDITORS LIST FOR EACH DEBTOR (the "<u>Consolidated Creditors Motion</u>")**

22.     I understand that through the Consolidated Creditors Motion, the Debtors seek authority to maintain a single consolidated matrix of the Debtors' creditors and their contact information, and to file a single consolidated list of the creditors that have the 30 largest unsecured claims against, and are not insiders of, the Debtors.

23.     Because the Debtors have several hundred creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements of the Local Rules is already a time-consuming and expensive task, on top of the Debtors' other obligations in chapter 11.  In addition, in the ordinary course prepetition, the Debtors maintain a consolidated accounts payable ledger, which does not separately identity

debts and amounts for each of the Debtors.[4]   The Debtors are also jointly party to various contracts, insurance policies, and other obligations that give rise to shared parties-in-interest between the Debtors, resulting in substantial overlap between the creditor body and other parties-in-interest in each case.   I believe that a Consolidated Creditors' Matrix is a cost-effective solution that avoids unnecessary overlap and duplication while still allowing the Debtors to provide appropriate notice to all creditors and applicable parties in interest during these cases.

24.    In addition, I believe that filing a Consolidated Top 30 Largest Unsecured Creditors List, in lieu of filing a separate Top 20 Largest Unsecured Creditors List for each of the Debtors, would clarify the picture of who the Debtors are for the U.S. Trustee.   I believe that because the Debtors' Top 20 Largest Unsecured Creditors Lists would likely overlap at least as to some creditors, filing a Top 20 Largest Unsecured Creditors List for each of the Debtors would be of less utility.   I also believe that permitting the Debtors to file the Consolidated Top 30 Largest Unsecured Creditors List will help to alleviate administrative burdens on the Debtors and their management teams, reduce costs to the estates in the chapter 11 cases, and avoid the possibility of duplicative service to an overlapping list of creditors.   I believe that the relief requested is, therefore, consistent with the administrative and procedural benefits that also favor joint administration of these cases.

---

[4] The Debtors typically track their creditors and make necessary intercompany ledger adjustments in the ordinary course to ensure that claims are properly allocated between the Debtors.  However, I understand that the records on which the Debtors are relying for the matrix do not always maintain the same separation in the ordinary course, placing a burden on the Debtors if a separate matrix were required in each case.

C.      **MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) PREVENTING SWEEP OR SETOFF OF CERTAIN LOCKBOX BY CREDITOR AND ORDERING IMMEDIATE TURNOVER OF FUNDS IN LOCKBOX TO DEBTORS' OPERATING ACCOUNT; AND (IV) SETTING A FINAL HEARING (the "Cash Collateral Motion")**

25.     I understand that through the Cash Collateral Motion, the Debtors seek relief, *inter alia*, authorizing the Debtors to use the Cash Collateral of the Prepetition Secured Creditors and providing adequate protection to the Prepetition Secured Creditors.

26.     I understand that prior to the Petition Date, the Debtors engaged in certain transactions with the Prepetition Secured Creditors that resulted in the Debtors granting liens on certain of the Debtors' assets to secure certain debt obligations to the Prepetition Secured Creditors.  The obligations and liens regarding the Prepetition Secured Creditors are summarized in greater detail above and in the Cash Collateral Motion.

27.     The Debtors have an immediate and critical need for the use of Cash Collateral in the earliest days of the chapter 11 cases and beyond.  I believe that use of Cash Collateral will allow the Debtors to fund necessary and imminent expenses required for the Debtors to maintain operations, as well as for the Debtors to fund other necessary expenses in chapter 11, such as employee payroll and benefits and utility services, which the Debtors believe will preserve and maximize the value of their estates.

28.     I understand that, other than Cash Collateral, the Debtors do not have access to cash necessary to fund the Debtors' operations in the earliest days of these cases.  Accordingly, access to Cash Collateral will provide the Debtors with the funds necessary to ensure that the Debtors have sufficient working capital and liquidity to maintain operations and proceed through their reorganizations.  I believe that without access to such liquidity and authority to use Cash

Collateral, the Debtors, their employees, and other constituents will face imminent and irreparable harm.

29.    According to the relief proposed by the Debtors through the Cash Collateral Motion, I understand that the Debtors shall be authorized to use Cash Collateral in accordance with a 13-week initial budget and subsequent budgets to be filed (as appropriate) at later dates in the chapter 11 cases.  I further understand that the Debtors' use of Cash Collateral shall be conditioned upon the Debtors' compliance with the Budget, with the understanding that the timing of revenue and expenses may vary from projections, except that the Debtors' actual aggregate disbursements shall be limited to 110 percent (110%) of projected aggregate disbursements in the Budget during the relevant period.  I further understand that the Debtors shall provide the Prepetition Secured Creditors with a line-by-line variance report that compares actual cash receipts and disbursements of the Debtors with corresponding amounts provided for in the Budget on a line-by-line basis for the week ending on the prior Saturday.

30.    The initial Budget proposed by the Debtors in connection with the Cash Collateral Motion shows that the aggregate value of Cash Collateral increases over the course of the initial 13-week period reflected in the Budget.  The Budget reasonably and accurately reflects projected revenues and expenses for the Debtors in the period depicted therein, and the Budget was prepared with significant input from the CFO, Controller, counsel, and myself based on historic, actual financials for the Debtors.

31.    Lastly, the Debtors seek through the Cash Collateral Motion an order prohibiting Alterna from sweeping or setting-off funds in the Lockbox and directing Alterna to turnover to the Debtors the proceeds in the Lockbox as of the Petition Date.  I understand that the contents of the Lockbox constitute proceeds of the Debtors' accounts receivable that were assigned to

Alterna.  Such relief would ensure that the Debtors have sufficient working capital and liquidity to maintain operations and proceed through their reorganizations, and further diminish the likelihood that the Debtors and other parties-in interest face imminent and irreparable harm in the early days of these chapter 11 cases.

**D.** **MOTION OF DEBTORS FOR ENTRY OF AN ORDER: (I) AUTHORIZING USE OF CASH MANAGEMENT PROCEDURES, BANK ACCOUNTS, AND EXISTING BUSINESS FORMS; (II) AUTHORIZING BERKSHIRE BANK TO ADMINISTER BANK ACCOUNTS; (III) AUTHORIZING DEBTORS TO MAINTAIN RESTRICTED ACCOUNTS; (IV) MODIFYING REQUIREMENTS OF SECTION 345(B) OF THE BANKRUPTCY CODE; AND (V) AUTHORIZING CONTINUED INTERCOMPANY RECORDKEEPING AND ALLOCATION PRACTICES ("<u>Cash Management Motion</u>")**

32.     I understand that through the Cash Management Motion, the Debtors seek authority to continue and maintain certain procedures and practices related to their business operations and cash management, including, <u>inter alia</u>, to continue to use existing bank accounts and business forms as consistent with prepetition practices.

33.     Prior to the commencement of these cases, and in the ordinary course of their businesses, the Debtors maintained certain centralized Cash Management Procedures to efficiently collect, monitor, transfer, and disburse funds generated by operations.  These Cash Management Procedures include procedures such as the approval of all cash disbursements by the Debtors' CEO, CFO, or Controller, internal accounting systems to allocate revenues and expenses among the Debtors and ensure that all transactions are properly accounted for and recorded, monthly reconciliation of the Debtors' accounts by a financial accountant and the Debtors' Controller, and other procedures designed to enable that the Debtors operate efficiently while ensuring that all transactions are appropriate monitored and accounted for.

34.     All wire transfers, ACH transfers, and other automated payment transactions are completed through Berkshire's website or bill.com.  Access to the Debtors' accounts is strictly

controlled and limited to only a handful of individuals at the companies, including the CEO, CFO, and the Controller.

35.    Both prior to and as of the Petition Date, CE Power maintained three bank accounts at Berkshire Bank: an operating account, a payroll account, and a deposit account.  All Bank Accounts are maintained by and in the name of CE Power; CE Springfield and CE Pittsfield do not have separate bank accounts as of the Petition Date (other than the Restricted Accounts)

36.    The payroll account is a zero-balance account through which payroll is funded from the operating account to the payroll company.  The deposit account is used for receivables that are not otherwise directed into a lockbox maintained by Alterna Capital Solutions LLC pursuant to the Invoice Purchase and Security Agreement between Alterna and the Debtors. Those Non-Lockbox Receivables are swept daily into the operating account, resulting in a zero ending balance in the deposit account in the ordinary course (although the deposit account may occasionally have in excess of **$250,000.00** at a certain point of a day depending on the timing of Non-Lockbox Receivables and the sweep).  Operating expenses other than payroll are funded directly from the operating account.

37.    I understand that the relief sought by the Debtors through the Cash Management Motion is meant to allow the Debtors to continue the Cash Management Procedures in the ordinary course following the Petition Date.  I believe that the Debtors' business operations and cash management capabilities would be negatively affected if they are required to modify their Cash Management Procedures, close their Bank Accounts, and cease using the Credit Cards.  In particular, I believe that if the Debtors are required to close the Bank Accounts and open new accounts, that would lead to delayed payments from customers, and the Debtors do not always

have sufficient cash reserves or access to credit to maintain operations without a continued and predicable stream of receivables. In addition, access to the Credit Cards allows the Debtors to make necessary payments in the ordinary course, particularly where smaller, local vendors do not accept other forms of payment.

38.    I understand that the Debtors also seek relief to continue using existing Business Forms. In the ordinary course of business, the Debtors use a third party to process checks that contain the Debtors' name and address printed thereon. To minimize administrative expense and delay, I believe that it is important that the Debtors continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the "Debtor-in-Possession" status. I also submit that parties in interest—including vendors and employees—will not be prejudiced if the Debtors are authorized to continue to use the Business Forms substantially in the form existing immediately before the Petition Date until the supply of such Business Forms is exhausted. Such parties undoubtedly will be aware of the Debtors' status as debtors-in-possession.

39.    I also understand that the Debtors seek authority for Berkshire Bank and Blackrock to continue to service certain Restricted Accounts, as explained in further detail in the Cash Management Motion. The funds in the Restricted Accounts are not available to fund ordinary operating expenses of the Debtors and, instead, are subject to various restrictions and/or are pledged to other parties as collateral and assurances of performance. I believe that requiring the Debtors to modify these Restricted Accounts would be highly disruptive to critical operations of the Debtors, could result in potential breaches of certain agreements and obligations, and would, overall, hinder the Debtors' reorganization efforts.

40.    Finally, In the ordinary course prior to the Petition Date, both CE Springfield and CE Pittsfield generate revenue from their separate operations.  Prepetition, the Non-Lockbox Receivables are paid into the deposit account and swept into the operating account maintained by CE Power. CE Power then funds expenses on behalf of all Debtors, including payroll for employees of CE Pittsfield and CE Springfield, operating expenses of those companies, and other expenses.  As a result of this system, the Debtors maintain an internal ledger system to track and allocate receivables and ensure that intercompany obligations are property recorded.

41.    In sum, because of the complexity of the Debtors' operations, any disruption to the Cash Management Procedures and use of the Bank Accounts would harm the Debtors and their estates.  Without maintaining these systems, the Debtors would be unable to track incoming receipts and make on-time payments, thereby hampering the Debtors from monitoring and maintaining their liquidity postpetition.  This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors fail to remit payment, could cause diminution in the value of the Debtors' estates to the detriment of all parties in interest.

**E.    MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO: (A) PAY PRE-PETITION EMPLOYEE AND CONTRACTED CONSULTANT COMPENSATION AND RELATED PAYROLL AND BENEFIT OBLIGATIONS; (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE; (C) MAINTAIN EMPLOYEE INSURANCE POLICIES AND PAY RELATED PREMIUMS; AND (D) MAINTAIN OTHER INSURANCE POLICIES AND PREMIUM FINANCING, AND PAY RELATED PREMIUMS AND OBLIGATIONS (the "<u>Payroll Motion</u>")**

42.    I understand that through the Payroll Motion, the Debtors seek authority to, <u>inter alia</u>, maintain various employee and employee-related programs and fund certain wage and other obligations that arose prior to the Petition Date.

43.    As of June 18, 2021, CE Pittsfield had 21 full-time employees, 6 of whom were salaried (the "<u>CE Pittsfield Salaried Employees</u>") and 15 of whom were compensated on an

hourly basis (the "CE Pittsfield Hourly Employees"), and CE Springfield had 27 full-time

employees, 9 of whom were salaried (the "CE Springfield Salaried Employees") and 18 of whom

were compensated on an hourly basis (the "CE Springfield Hourly Employees").[5]  The Hourly

Employees are paid on a weekly basis each Friday for their services in the preceding period of

Sunday through Saturday of the prior week.  The Salaried Employees are paid on a bi-weekly

basis (every other Friday) for compensation for the two-week period prior to the date of

payment.  Payroll is funded through Trion Solutions on Wednesday of each week in the amount

required for that upcoming payroll date.

44.     The Employees perform a variety of critical functions for the Debtors, including

operations, maintenance, administrative and accounting services, and management.    The

Employees' skills, knowledge, and understanding of the Debtors' infrastructure, assets,

customers, and operations are essential to the effective operation of the Debtors' businesses and

to a successful reorganization that maximizes value for parties-in-interest of the Debtors' estates.

45.     In addition to the Employees, the CE Power has also entered into certain

employment and consulting agreements with the following individuals (together, the "CE Power

Managers"):[6]

(a)     **Richard Fish**: CE Power and I are parties to that certain Employment
Agreement dated March 15, 2019, pursuant to which I serve as the Chief
Executive Officer of the Debtors.  My Employment Agreement with CE
Power provides for a two-year term, with annual renewals unless
terminated in writing not less than 60 days before the end of such term.

(b)     **Linwood Bubar**:  CE Power and Mr. Bubar are parties to that certain 100-
Day Employment Agreement dated May 25, 2021, pursuant to which Mr.
Bubar serves as the Chief Operating Officer of the Debtors.

---

[5] The figures in this paragraph include double-counting four (4) accountants who are employed by both CE
Springfield and CE Pittsfield.

[6] Among the CE Power Managers, David Beavens, Kevin Bolin, and Linwood Bubar also are members and owners
of CE Power.

(c)     **David Beavens**:  CE Power and Mr. Beavens are parties to that certain Consulting Agreement dated April 1, 2019, pursuant to which Mr. Beavens is retained to serve as the Chief Financial Officer and to provide consulting services, including developing projects, negotiating or sourcing commercial contracts, working on strategic issues, and performing other required duties.  Mr. Beavens' Consulting Agreement provides for a two-year term, with automatic annual renews unless terminated not less than 90 days before such term ends.

(d)     **Joanne Dial**:   CE Power and Ms. Dial are parties to a consulting agreement through which Ms. Dial provides human resources services.  Ms. Dial's retention provides for termination upon 30-days' notice of either party.

(e)     **Yuri Verbowski**:  CE Power and Mr. Verbowski are parties to that certain Contract for Consulting Services dated March 1, 2019, pursuant to which Mr. Verbowski provides information technology services.   Mr. Verbowski's Contract for Consulting Services provides for termination upon at least 30-days' written notice.

(f)     **Kevin Bolin**:   CE Power and Mr. Bolin are parties to that certain Consulting Agreement dated March 15, 2019, pursuant to which Mr. Bolin is retained to provide consulting services, including developing projects, negotiating or sourcing commercial contracts, working on strategic issues, and performing other required duties.  Mr. Bolin's Consulting Agreement provides for a three-year term, with automatic annual renews unless terminated not less than 90 days before such term ends.  All compensation for Mr. Bolin under the Consulting Agreement is paid to SGC Advisors, LLC, a special purpose entity in which Mr. Bolin is the sole member.

46.     I understand that the Debtors do not seek to modify the foregoing retention terms or agreements of the CE Power Managers in any way through the Payroll Motion, but seek approval to pay certain obligations in the ordinary course and to preserve the status quo with the CE Power Managers to facilitate the successful operations and reorganizations of the Debtors in the chapter 11 cases.

47.     Just as the Debtors depend on the Employees and the CE Power Managers to operate their businesses on a daily basis, the Employees and the CE Power Managers also depend on the Debtors.  Indeed, I understand that many of these individuals and their families

rely on payments received from the Debtors for their basic living necessities.  In an effort to minimize the personal hardship to the individuals and to maintain morale and stability in the Debtors' business operations during this critical juncture, I understand that the Debtors seek authority to continue to pay and honor (subject to applicable Orders of this Court and the Bankruptcy Code) amounts arising under or in connection with the Debtors' obligations to the Employees and the CE Power Managers.

48.     I also understand that the Debtors participate in, or are obligated under, a number of different wage, salary, consulting, and benefit structures, programs, and plans, all as more particularly described in the Payroll Motion.  I have reviewed the Payroll Motion, and to the best of my information and belief, the factual statements and descriptions in the Payroll Motion are true and accurate as of the Petition Date, including as to the Employee Compensation Obligations, Payroll Obligations, and Employee Benefits and the amounts due and owing in regard thereof.

49.     In particular, weekly gross payroll for the Hourly Employees on the first postpetition pay date after the Petition Date is projected to be not more than **$75,000.00**, and gross payroll for Salaried Employees on the next pay date after the Petition Date is projected to be not more than **$115,000.00**.  I understand that portion of the Employee Compensation Obligations paid after the Petition Date will constitute compensation for prepetition services.

50.     The Debtors also incur certain Premium Obligations and Financing Obligations relating to Insurance Policies, which, as described in more detail in the Payroll Motion, cover events such as cybercrime, pollution liability, property liability, and management and D&O liability.  CE Power is also a party to that certain Commercial Insurance Premium Financing and Security Agreement (the "PFA") with Talbot Premium Financing, LLC (as subsequently

assigned to AFCO Credit Corp. ("__AFCO__")).  A true and correct copy of the PFA is attached to

the Payroll Motion as **__Exhibit A__**.  I believe that payments under the PFA are current, and that the

terms of the PFA (including 4.29% interest) are commercially reasonable.

51.     I understand that the Debtors are required to maintain insurance coverage during

these chapter 11 cases, and that a cancellation of the financed policies would have material

adverse consequences to the Debtors' businesses and the chapter 11 process.  As a result, it is

critical for the Debtors to have authority to maintain the PFA and pay the Insurance Obligations

in the ordinary course, including in the event that a portion of an Insurance Obligation constitutes

a prepetition obligation.

52.     I believe that the Debtors' ability to fund the Employee Compensation

Obligations and Payroll Obligations, and to maintain the Employee Benefits Obligations, is

indispensable to the reorganization of the Debtors' businesses.  The Employees' morale directly

affects their effectiveness and productivity, and in turn the Debtors' effectiveness and

productivity.  I believe that it is critical that the Debtors continue, in the ordinary course, those

personnel policies, programs, and procedures that were in effect prior to the Petition Date, all as

detailed in the Payroll Motion.  If such obligations are not timely paid postpetition, Employees

likely would suffer extreme personal hardship, may be unable to pay their daily living expenses,

and may discontinue their employment with the Debtors.  A loss of workforce morale and

goodwill at this juncture would undermine the Debtors' stability and, undoubtedly, would have

an adverse effect on the Debtors, their customers, the value of the Debtors' assets and business,

and the Debtors' ability to achieve their objectives in these chapter 11 cases.  Thus, I believe that

the imminent relief requested in the Payroll Motion is necessary to the Debtors' success in these

cases.

**F.      MOTION OF DEBTORS FOR ENTRY OF AN ORDER: (I) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES; (II) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; (III) APPROVING PROCEDURES FOR RESOLVING ADDITIONAL ADEQUATE ASSURANCE REQUESTS; AND (IV) GRANTING RELATED RELIEF (the "<u>Utilities Motion</u>")**[7]

53.     I understand that through the Utilities Motion, the Debtors seek authority to provide certain assurances of payment to utility provides and for this Court to establish certain procedures related to ensuring uninterrupted utility services for the Debtors in chapter 11.

54.     In the ordinary course of the Debtors' operations and management of their businesses and property, the Debtors receive electricity, natural gas, water and sewage and other similar services from a number of utility companies.   A true and accurate list of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as **<u>Exhibit A</u>**.

55.     Uninterrupted Utility Services are essential for the Debtors to maintain their waste-to-energy production and related operations, including at their Springfield and Pittsfield facilities.   Any interruption in Utility Services, even for a brief period of time, would severely, and potentially irreparably, disrupt the Debtors' operations and jeopardize the Debtors' reorganization efforts.   Accordingly, I believe it is critical to the success of the chapter 11 cases and in the best interests of creditors that the Utility Services continue without interruption during these cases.

56.     The Debtors, collectively, pay a total of approximately **<u>$103,000.00</u>** each month for Utility Services, which amount is based on the average monthly invoices for the Utility Providers over the approximately twelve-month period before the Petition Date.   I anticipate that

---

[7] For the avoidance of doubt, the Debtors do not seek a determination regarding the Utilities Motion on an emergency or expedited basis.

the costs of Utility Services during the pendency of the cases will be roughly consistent with

prepetition costs, subject to any operational changes or asset sales that may occur (with such

changes also subject to this Court's approval to the extent required by the Bankruptcy Code).

57.    The Debtors intend to, and have the ability to, pay postpetition obligations owed

to the Utility Providers in a timely manner.  I believe that the Debtors' cash on hand, together

with cash flow from operations, and their requested authority to use cash collateral will provide

sufficient liquidity to pay all of the Debtors' obligations to the Utility Providers in the ordinary

course postpetition, consistent with their prepetition practice.   In addition, I believe that the

Debtors reliance on the Utility Services for the operation of their businesses is a powerful

incentive to stay current on their utility obligations.  To provide additional assurance of payment

to the Utility Providers I understand that the Debtors propose depositing the amount of

**$51,500.00** into a segregated deposit account within thirty (30) days of the Petition Date.  The

Adequate Assurance Deposit constitutes 50% of the aggregate monthly average invoices for the

Utility Services.

58.    The Debtors have made a good-faith effort to identify all entities that are Utility

Providers and include them on the Utility Service List.

59.    In sum, I believe that the Adequate Assurance Procedures are necessary for the

Debtors to implement their chapter 11 strategy without unnecessary and costly disruptions on

account of discontinued Utility Services.   If the Adequate Assurance Procedures are not

approved, the Debtors will be confronted with and forced to address numerous requests for

adequate assurance of payment from their Utility Providers at a critical time for their

organization.  Moreover, the Debtors could be blindsided by a Utility Provider alleging that it is

not adequately protected, and, therefore, either is entitled to make an exorbitant demand for

payment to continue providing service or discontinue providing service to the Debtors altogether.

Such an outcome would jeopardize the Debtors' ability to successfully reorganize.

[*The remainder of this page is intentionally left blank*]

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 25, 2021

Richard Fish
*President and Chief Executive Officer of the Debtors*