UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re:<br><br>Community Eco Power, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 21-30234<br><br>(Jointly Administered) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER: (I) APPROVING OF THE DEBTORS' KEY EMPLOYEE RETENTION PLAN; (II) AUTHORIZING THE DEBTORS TO MAKE PAYMENTS PURSUANT TO THE KEY EMPLOYEE RETENTION PLAN; AND (III) GRANTING RELATED RELIEF**

Community Eco Power, LLC ("CE Power"), Community Eco Springfield, LLC ("CE Springfield"), and Community Eco Pittsfield, LLC ("CE Pittsfield"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move this Court (the "Motion"), pursuant to §§ 363(b) and 503(c) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order, substantially in the form filed herewith (the "KERP Order"), providing the following relief: (i) approving of the KERP (as defined below); (ii) authorizing the Debtors' to make certain payments pursuant to the KERP; and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

**INTRODUCTION**

1. The Debtors' employees are the most important component of the Debtors' day-to-day operations, and the Debtors' long-term success is dependent on maintaining certain key

---

[1] The last four digits of Community Eco Power, LLC's federal taxpayer identification number are 5513. See 11 U.S.C. § 342(c)(1).  The last four digits of Community Eco Springfield, LLC's federal taxpayer identification number are 4363.  See id.  The last four digits of Community Eco Pittsfield, LLC's federal taxpayer identification number are 8358.  See id.  The principal place of business for the Debtors is 500 Hubbard Avenue, Pittsfield, Massachusetts 01201, and the Debtors' mailing address is P.O. Box 510, Amesbury, Massachusetts 01913.

employees through the chapter 11 cases and beyond. During the course of these chapter 11 cases, the Debtors' employees have been asked to take on new responsibilities and perform tasks outside the scope of their usual prepetition work. These additional tasks have placed a heavy burden on all of the Debtors' workers; however, certain employees are carrying a disproportionately high percentage of this increased workload. This increased level of work, together with the risks and uncertainty of the chapter 11 process, have caused several important employees to terminate their employment relationship with the Debtors. In an effort to retain certain key employees, preserve and maximize value of the estates for the benefit of all parties in interest, and ensure a smooth and orderly emergence from these chapter 11 cases, the Debtors, in close consultation with their advisors, have determined that it is necessary to adopt policies to incentivize certain integral employees to remain with the Debtors through the confirmation of their respective plans of reorganization.

2. By this Motion, the Debtors seek approval of a key employee retention plan (the "KERP"), pursuant to which the Debtors propose to pay six (6) non-insider employees (collectively, the "KERP Participants") cash awards in the potential aggregate total amount of **$87,500.00** if the KERP Participants remain in the Debtors' employ through the confirmation of the Debtors' respective plans of reorganization. The KERP Participants are not directors or officers of the Debtors, but instead fulfill vital roles that are instrumental to the success of the Debtors' operations. In particular, the KERP Participants provide and manage critical accounting, cash management, facilities oversight, and maintenance functions that are the backbone of the Debtors' operations and are not readily replaceable, based the KERP Participants' skills, unique knowledge, and familiarity with the Debtors' operations. The departure of any KERP Participant during these chapter 11 cases would be disruptive to ongoing

operations and would hinder the Debtors' ongoing efforts to successfully emerge from bankruptcy. As a result, the Debtors believe that approval and implementation of the KERP is necessary and appropriate to avoid costly disruptions to the Debtors' businesses and to protect and maximize value for the benefit of creditors during the remainder of these chapter 11 cases.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

3. The United States District Court for the District of Massachusetts (the "District Court") has original, but not exclusive, jurisdiction over the Debtors' chapter 11 cases pursuant to 28 U.S.C. § 1334(b). By the Massachusetts District Court's standing order of reference, this matter is referred to this Court pursuant to 28 U.S.C. § 157.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has constitutional authority to enter final judgment in this proceeding.

5. Venue over these chapter 11 cases is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

6. The statutory predicates and applicable rules for relief sought herein are §§ 363(b) and 503(c) of the Bankruptcy Code.

## BACKGROUND

7. On June 25, 2021 (the "Petition Date"), the Debtors commenced the above-captioned cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

8. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 [Docket No. 15]. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to §§ 1007(a) and 1108 of the Bankruptcy Code.

9. On July 15, 2021, the United States Trustee appointed a statutory committee of unsecured creditors pursuant to § 1102(a)(1) of the Bankruptcy Code [Docket No. 80].

10. A description of the Debtors' capital and corporate structures, businesses, and the events leading to the commencement of the chapter 11 cases is set forth in the *Declaration of Richard Fish in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 5], which is incorporated herein by reference.

11. The Debtors' respective schedules of assets and liabilities and statements of financial affairs (the "Schedules") were filed on July 23, 2021, and amended on August 24, 2021.

## THE KEY EMPLOYEE RETENTION PLAN

12. The Debtors developed the KERP to help ensure that the KERP Participants will continue to work with the Debtors and remain motivated to provide services above-and-beyond the expected scope of their prepetition responsibilities during the remainder of these chapter 11 cases. The Debtors' workforce is presently made up of both full-time salaried or hourly employees, and certain executive-level employees who are employed on a contract basis. Among this workforce, the Debtors worked to carefully identify a small set of individuals whose day-to-day contributions are particularly indispensable to the Debtors' ongoing operations and reorganizations. The Debtors also took care to develop a KERP that is not outsized in comparison with the Debtors' past practices of providing bonus and incentive compensation to employees, and to ensure that the overall cost the KERP is fair and reasonable in light of the Debtors' present financial circumstances and the potential operational disruptions that could occur if any individual KERP Participant decided to leave the Debtors' employ prior to the Debtors' emergence from these chapter 11 cases.

13. Attached hereto as **Exhibit A** are retention plan letters (the "KERP Letters") for each KERP Participant, which outline the terms of the KERP and the amount of each respective payment intended to be made under the KERP. The KERP Participants and the payments that the Debtors seek to make pursuant to the KERP are summarized as follows:

| KERP Participant | Position | Payment Amount |
|---|---|---|
| Cynthia Dixey | Controller | $25,000.00 |
| John Foley | Facility Manager | $25,000.00 |
| Darrell Hill | Facility Manager | $25,000.00 |
| Caren Reed | Assistant Controller | $10,000.00 |
| Cassandra Swift | Staff Accountant | $2,500.00 |
| **Aggregate KERP Payment** | | **$87,500.00** |

The Debtors intend to make payments to KERP Participants upon confirmation of plans of reorganization in these chapter 11 cases. The purpose of this proposed timing is to ensure that the KERP Participants are motivated to remain employed with the Debtors during the remaining pendency of these chapter 11 cases. In the event that a KERP Participant is no longer employed with the Debtors as of confirmation of the plans of reorganization in these chapter 11 cases– whether as a result of voluntary resignation or termination by the Debtors–that KERP Participant shall no longer be eligible to receive the designated payment under the KERP. The KERP does not include any performance-based metrics that make payment under the KERP contingent on the achievement of operational goals, but rather the KERP is designed to be purely retentive in nature and to motivate the KERP Participants to remain with the Debtors during a critical period of the Debtors' restructuring efforts.

14. None of the KERP Participants are "insiders" of the Debtors, as that term is defined pursuant to § 101(31) of the Bankruptcy Code. No KERP Participant is an owner,

director, or officer of any of the Debtors, nor exercises a high degree of control over the Debtors' overall corporate governance or operations as a whole.  While the KERP Participants provide invaluable services and leadership to the Debtors, they each report directly to an officer-level employee of the Debtors and are tasked with carrying out discrete strategic and operational goals that are set by the Debtors' directors and officers.  The Debtors' leadership team relies on the KERP Participants to ensure that the Debtors' goals are carried out and that daily operations run smoothly and without disruption.

15.    During the course of these chapter 11 cases, the KERP Participants have been asked by the Debtors to take on new and additional responsibilities that are often outside the scope of their normal prepetition tasks.  For example, the Debtors have relied on KERP Participants to work with the Debtors' legal advisors in the preparation of the Debtors' chapter 11 petitions, first day motions, and numerous other bankruptcy pleadings, and the Debtors have tasked KERP Participants on a regular basis with generating financial reports that the Debtors are obligated to provide to this Court and other parties-in-interest or that the Debtors' leadership team has relied on as the Debtors explore various restructuring paths.  The Debtors have also asked KERP Participants to attend to and resolve various operational obstacles that have arisen as a result of the Debtors' decisions to pursue chapter 11 restructurings.  In addition to these added responsibilities, the KERP Participants continue to do an outstanding job carrying out their prepetition job responsibilities, which are vital to the Debtors' continued success and prospects for emerging from bankruptcy.

16.    Given the demands placed upon the KERP Participants and the Debtors' employees as a whole during these chapter 11 cases, the Debtors believe that employees may be motivated to leave the Debtors' employ as a result of, among other things, the uncertainty

created by the Debtors' ongoing restructuring efforts (and the Debtors have, in fact, lost several employees during the chapter 11 process). The KERP Participants have developed valuable institutional knowledge regarding the Debtors' business operations during their time employed with the Debtors, and the Debtors feel that their experience and expertise would be exceedingly difficult to replace. If any individual KERP Participant chose to end their employment with the Debtors before the Debtors emerge from bankruptcy, it would hinder the Debtors' restructuring efforts and very likely erode the value of the Debtors' assets and businesses.

17. Given the demands placed upon the KERP Participants and the value that they provide to the Debtors, the Debtors believe that the KERP is appropriate and reasonable, and is a sound exercise of the Debtors' business judgment. The Debtors submit that the KERP, if approved by this Court, makes it more likely that the KERP Participants will remain employed with the Debtors until the confirmation of plans of reorganization, and that retention of the KERP Participants will protect and maximize the value of the Debtors' estates for the benefit of all stakeholders and parties-in-interest.

## BASIS FOR RELIEF

**I.    The KERP is a Sound Exercise of the Debtors' Business Judgment.**

18. Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Debtors are generally said to have "considerable discretion" for relief requested under § 363(b). White v. Official Comm. Of Unsecured Creditors (In re Cadkey Corp.), 317 B.R. 19, 22 (D. Mass. 2004). Bankruptcy courts in this district have allowed debtors to use property of the estate outside the ordinary course of business if debtors have exercised "reasonable business judgment and articulated a business justification for such use." In re SW Boston Hotel Venture, LLC, 2010 WL 3396863, at *4 (Bankr. D. Mass. Aug. 27, 2010)

7

Case 21-30234    Doc 303    Filed 10/29/21    Entered 10/29/21 10:39:06    Desc Main
Document    Page 8 of 16

(granting debtors' motion to pursue leasing strategy under § 363(b) based on reasonable business judgment). The "business judgement" standard has been embraced by other bankruptcy courts both within and outside this circuit. See, e.g., Milk Indus. Regul. Off. of the Commonwealth of P.R. v. Rosa Dairy Farm, Inc. (Ros Dairy Farm, Inc.), 622 B.R. 806, 813 (1st Cir. B.A.P. 2020) ("When considering whether to authorize a debtor-in-possession's use, sale or lease of property of the estate, courts usually apply a 'business judgment test'"); In re Borders Group, Inc., 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

19. If a debtor articulates a valid business justification, the law vests a debtor's decision to use property outside the ordinary course of business with a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted). "A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass 2001).

20. Applying the business judgment rule in chapter 11 cases, courts have regularly permitted payments to employees that are outside the normal course of business if they are supported by a valid business justification. See, e.g., id. at 80-81 ("Bankruptcy courts will approve key employees retention programs if the Debtor has used proper business judgment in formulating the program and the court finds the program to be 'fair and reasonable.'"); Borders Group, 453 B.R. at 477 (approving of employee retention plan, based on finding that "the Proposed Plan[] [is] the product of the Debtors' proper exercise of business judgment"); In re

8

Global Home Prods., 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.").

21. The proposed implementation of the KERP is a proper exercise of the Debtors' reasonable business judgment and is backed by well-founded business justifications. The KERP Participants possess invaluable experience and knowledge of the Debtors' businesses, assets, and operations. The Debtors cannot easily replace the KERP Participants (particularly in the present labor market), and a decision by any individual KERP Participant to leave employment with the Debtors would lead to efficiency losses and a costly search to find an adequate replacement (who may not exist or be available to hire). Retaining the KERP Participants through the remainder of these chapter 11 cases is critical to ensuring that the Debtors' businesses continue to operate without significant disruption, and to protecting and maximizing the value of the Debtors' estates as the Debtors work to develop plans to emerge from bankruptcy. Retaining the KERP Participants will maximize the potential return to creditors and stakeholders in any plans of reorganization proposed by the Debtors.

22. Accordingly, the Debtors submit that the KERP satisfies the business judgement standard relied on by bankruptcy courts to evaluate the use of property of the estate outside of the ordinary course of business, and that this Court should approve the KERP as a valid exercise of the Debtors' business judgment in accordance with § 363(b)(1).

**II.    The KERP is Justified by the Facts and Circumstances of the Chapter 11 Cases.**

23. Bankruptcy courts also typically evaluate employee retention plans under § 503(c)(3) of the Bankruptcy Code, which permits post-petition payments to a debtor's employees outside the ordinary course of business if such payments are "justified by the facts and

circumstances of the case." 11 U.S.C. § 503(c)(3). While courts within this circuit have not settled on a test for determining whether a proposed compensation plan passes muster under § 503(c)(3), bankruptcy courts elsewhere in the country have held that the standard under § 503(c)(3) is "no different than the business judgment standard under section § 363(b) of the Bankruptcy Code." In re Velo Holdings, Inc., 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012); see also, Borders Group, 453 B.R. at 474–75 ("the legal standard under section 363(b) is no different than section 503(c)(3)"); In re Patriot Coal Corp., 492 B.R. 518, 530 (Bankr. E.D. Mo. 2013).

24. In the context of determining whether proposed compensation programs satisfy the business judgment standard under §§ 363(b) and 503(c)(3), many courts have applied the six factors identified in In re Dana Corp., 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006):

  i. Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

  ii. Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

  iii. Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

  iv. Is the plan or proposal consistent with industry standards?

  v. What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

  vi. Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

See also In re GT Advanced Technologies, Inc., 2015 WL 5737181 at *8–9 (Bankr. D. N.H. Sept. 30, 2015) (determining that § 503(c)(3) requires a level of scrutiny higher than ordinary business judgment under § 363(b), but nonetheless applying the Dana factors to determine

whether the proposed retention plan was justified by the "facts and circumstances" of the case). No single Dana factor is dispositive, and the absence of a factor is "not fatal" to a debtor's retention plan if the interests of the estate are sufficiently protected by the proposed plan. See, e.g., Borders Group, 453 B.R. at 477 (finding that lack of independent counsel in formulating a compensation plan did not preclude the court from approving of the plan); see also In re FirstEnergy Solutions Corp., 591 B.R. 688, 697 (Bankr. S.D. Ohio 2018) ("These factors are neither exhaustive nor of inherently equal weight."). The Debtors respectfully submit that the KERP satisfies the standards required by § 503(c)(3), including pursuant to the Dana factors.

25.    First, there is a reasonable relationship between the KERP and the desired results to be obtained by the Debtors, namely the retention of the KERP Participants through the confirmation of plans of reorganization. The Debtors designed the KERP out of a desire to ensure that the KERP Participants, who were identified as pivotal to the Debtors' business success and continued operations during these chapter 11 cases, would remain employed with the Debtors through the confirmation of plans of reorganization. The decision to tie payments under the KERP to confirmation of plans of reorganization will motivate the KERP Participants to remain in their present positions until the Debtors are able to confirm plans and exit chapter 11. The Debtors determined that it was appropriate to provide additional compensation to key employees whose workloads and responsibilities have significantly increased as a result of the Debtors' decisions to file for chapter 11 protection and, in turn, might be motivated to find alternative employment. The KERP Participants each possess valuable and marketable skills that are highly sought after, and each KERP Participant would be difficult to replace in the event that he or she voluntary ended their employment with the Debtors. The Debtors believe that the

KERP adequately and appropriately incentivizes the KERP Participants to remain with the Debtors until plans of reorganization can be confirmed.

26. <u>Second</u>, the cost of the KERP is reasonable in the context of the Debtors' assets and liabilities. As described to this Court in the *Motion of Debtors for Entry of an Order Authorizing the Debtors to: (A) Pay Pre-Petition Employee and Contracted Consultant Compensation and Related Payroll and Benefit Obligations; (B) Continue Employee Benefit Programs in the Ordinary Course; (C) Maintain Employee Insurance Policies and Pay Related Premiums; and (D) Maintain Other Insurance Policies and Premium Financing, and Pay Related Premiums and Obligations* [Docket No. 7] (the "<u>Payroll Motion</u>"), the Debtors' weekly gross payroll to salaried, hourly, and contract employees is approximately $190,000.00. In light of this regular payroll expense, the Debtors believe that the potential aggregate cost of $87,500.00 for the KERP is relatively modest, particularly in light of the value protecting nature of the KERP. Further, the cost of the KERP represents far less than 1% of the Debtors' pre-petition annual revenue, a metric that some courts have relied on to evaluate the reasonable cost of a proposed compensation plan. <u>See</u>, <u>e.g.</u>, <u>In re Global Aviation Holdings, Inc.</u>, 478 B.R. 142, 152 (Bankr. E.D. N.Y. 2012) (finding the cost of a KERP to be reasonable where proposed payments amounted to 0.014% of the debtors' previous annual revenue); <u>Borders Group</u>, 453 B.R. at 475 (finding that the cost of compensation plans was reasonable where proposed payments amounted to 0.17% of the debtors' previous annual revenue).

27. <u>Third</u>, the scope of the KERP is fair and reasonable. While the KERP does discriminate among employees, the Debtors took care in selecting the KERP Participants and believe that the KERP does not discriminate unfairly. As previously described, the Debtors believe that the KERP Participants are those non-insider employees who have been tasked with

12

the greatest additional responsibility as a result of the Debtors' chapter 11 filings, whose services are particularly instrumental in the Debtors' continued success during, and eventual emergence from, bankruptcy, and whose skills and knowledge would be the most difficult to replace in the event that they decided to voluntarily leave employment with the Debtors. The Debtors submit that the relatively modest scope of the KERP is reasonable and was purposefully designed to limit the cost of the KERP, and the Debtors believe that the KERP is fair and reasonable in the manner in which it designates employees.

28. **Fourth**, the KERP is consistent with industry standards. The Debtors believe that paying retention bonuses is a common occurrence among businesses in the same industry as the Debtors. Furthermore, in the absence of evidence regarding industry standards, some courts have looked to whether proposed compensation plans are consistent with past practices of a debtor. See, e.g., In re Mesa Air Group, Inc., 2010 WL 3810899 at *3 (Bankr. S.D.N.Y. Sept. 24, 2010). In the past, the Debtors' have paid both retention and incentive bonuses to certain employees. For example, when the Debtors acquired their businesses from Covanta in 2019, the Debtors developed a 12-month retention program to encourage employees to remain with the Debtors. Through that program, the Debtors paid $284,735.00 in retention bonuses. Before the Petition Date, the Debtors also had a short-term incentive program ("STIP"), pursuant to which the Debtors paid incentive bonuses to certain employees for achieving various operational milestones. The Debtors paid STIP bonuses as a result of goals met in 2019.

29. **Fifth**, the Debtors have exercised more than sufficient due diligence in determining the need for the KERP and its scope. The Debtors considered the critical services provided by the KERP Participants and the additional workload placed on the KERP Participants as a result of these chapter 11 cases. In light of the uncertainty created by these bankruptcy cases

and the likelihood that a KERP Participant could decide to seek alternative employment in the absence of additional compensation, the Debtors believe that additional measures are appropriate and necessary to ensure that the KERP Participants remain motivated to continue to work with the Debtors during the course of these cases. While some bankruptcy courts have considered whether a debtor's due diligence includes consulting with outside compensation consultants and undertaking a comparative market analysis, the Debtors submit that in light of the cost of the KERP and the overall size of these chapter 11 cases, the level of due diligence undertaken by the Debtors is appropriate and justified.

30. <u>Sixth</u>, the Debtors have relied on their advisors in designing the KERP and ensuring that the cost and scope of the KERP is appropriate and does not run afoul of any of the requirements of the Bankruptcy Code. The input of the Debtors' advisors has shaped the KERP proposed by the Debtors, and the Debtors believe that this level of independent counsel is appropriate and reasonable in light of the facts and circumstances of these cases.

31. Accordingly, the Debtors respectfully submit that the KERP satisfies the business judgment standard required by § 503(c)(3) and the <u>Dana</u> factors.

**III.    Section 503(c)(1) is Inapplicable to the KERP.**

32. Lastly, the Debtors submit that an analysis of the KERP pursuant to § 503(c)(1) of the Bankruptcy Code is unnecessary, as none of the KERP Participants are "insiders." Section 503(c)(1) was added the Bankruptcy Code in 2005 as part of the BAPCPA amendments and was intended to address what Congress believed to be an abuse of the bankruptcy process whereby executives of chapter 11 debtors received substantial bonuses during a chapter 11 case. Congress designed § 503(c)(1) to mount a substantial barrier to the payment of retention bonuses to insiders during a chapter 11 case. See <u>GT Advanced Technologies, Inc.</u>, 2015 WL 5737181 at

14

*4 ("bonuses offered to retain the employment of insiders are prohibited unless the debtor is able to meet the strict requirements set forth in § 503(c)(1)").

33.  As the term is defined pursuant to § 101(31), none of the KERP Participants is an insider of the Debtors.  Section 101(31)(B) of the Bankruptcy Code defines "insider" as any director of the debtor, officer of the debtor, person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor.  "For a person to be considered an insider it must appear that they have 'at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets.'"  In re Boston Pub. Co., Inc., 209 B.R. 157, 169 (Bankr. D. Mass. 1997) (quoting In re Babcock Dairy Co. of Ohio, Inc., 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)). The job responsibilities of the KERP Participants do not give them sufficient control over the Debtors' operations to qualify them as "persons in control" of the Debtors.  Each of the KERP Participants is responsible for a discrete area of the Debtors' overall business operations, and none is responsible for directing the Debtors' general business strategy.

34.  The Debtors respectfully submit that none of the KERP Participants is an insider of the Debtors, and, therefore, analysis of the KERP under § 503(c)(1) of the Bankruptcy Code is not required.

## NOTICE

35.  Notice of this Motion shall be served on the following parties on the date and in the manner set forth in the certificate of service: (a) the United States Trustee; (b) the counsel to the Official Committee of Unsecured Creditors; (c) the Debtors' secured creditors or, if applicable, to counsel representing them; (d) the non-insider holders of the 20 largest unsecured claims against each of the Debtors or, if applicable, to counsel representing such holders; (e)

applicable federal and state taxing authorities; (f) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (g) the KERP Participants. The Debtors submit that such notice is sufficient under the circumstances of the relief sought in the Motion.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Motion, the Debtors respectfully request that this Court enter the KERP Order, substantially in the form filed herewith: (i) approving the KERP; (ii) authorizing the Debtors to make payments pursuant to the KERP upon occurrence of the applicable triggering events; and (iii) granting such other and further relief as is just and proper.

Dated: October 29, 2021

Respectfully submitted,

**BERNSTEIN, SHUR, SAWYER & NELSON, P.A.**

*/s/ D. Sam Anderson*
D. Sam Anderson (PHV# 099809ME)
Adam R. Prescott (BBO# 684381)
Kyle D. Smith (PHV# 0066655ME)
100 Middle Street
PO Box 9729
Portland, Maine 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
sanderson@bernsteinshur.com
aprescott@bernsteinshur.com
kdsmith@bernsteinshur.com

*Counsel to the Debtors and Debtors in Possession*