# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### WESTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Community Eco Power, LLC, *et al.*,[1] | Case No. 21-30234 |
| Debtors. | (Jointly Administered) |

## ORDER GRANTING SALE MOTION RELATING TO CERTAIN ASSETS OF COMMUNITY ECO PITTSFIELD, LLC

Community Eco Pittsfield, LLC ("CE Pittsfield") filed the Motion for Authority to Sell Certain Assets of Community Eco Pittsfield, LLC and to Assign Certain Permits and Licenses in Relation Thereto (the "Sale Motion")[2] and the Notice of Motion for Authority to Sell Certain Assets of Community Eco Pittsfield, LLC and to Assign Certain Permits and Licenses in Relation Thereto (the "Sale Notice"). At the hearing on the Sale Motion (the "Sale Hearing"), counsel for Casella Waste Management of Massachusetts, Inc. ("Casella" and Casella and/or any entity designated by Casella to purchase certain assets of CE Pittsfield, the "Buyer") and counsel for CE Pittsfield made offers of proof as to the fact that the Buyer is a good faith purchaser for value. All objections to such offers of proof, and to the Sale Transaction (defined below), if any, were either resolved or overruled during the Sale Hearing. This Court being fully advised and having

---

[1] The last four digits of Community Eco Power, LLC's federal taxpayer identification number are 5513. See 11 U.S.C. § 342(c)(1). The last four digits of Community Eco Springfield, LLC's federal taxpayer identification number are 4363. See id. The last four digits of Community Eco Pittsfield, LLC's federal taxpayer identification number are 8358. See id. The principal place of business for the Debtors is 500 Hubbard Avenue, Pittsfield, Massachusetts 01201, and the Debtors' mailing address is P.O. Box 510, Amesbury, Massachusetts 01913.

[2] Capitalized terms used, but not defined in this Sale Order, shall have the meanings ascribed to such terms in the Sale Motion.

determined that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief herein granted,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of the above-captioned jointly administered cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Sale Motion are §§ 105(a), 363 and 365 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-5 and 6004-1 of this Court's local rules of procedure (the "Local Rules").

C.    Proper, timely, adequate and sufficient notice of: (i) the Sale Motion; (ii) the Sale Hearing; (iii) the transactions described in the Asset Purchase Agreement attached hereto as **Exhibit A** and incorporated herein by reference (the "APA"); and (iv) the assignment of the permits and/or licenses listed on **Schedule 1** to the APA (the "Selected Permits") has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.  Such notice was good, sufficient, and appropriate under the particular circumstances of this chapter 11 case, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale Transaction, or the assignment of the Selected Permits is or shall be required.

D.    As demonstrated by: (i) the testimony and other evidence proffered or adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, CE Pittsfield has marketed the assets being sold pursuant to the APA (the "Purchased Assets")[3]

---

[3] The term "Purchased Assets" shall include and refer to the "Selected Permits."

and conducted the sale process in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as well as in accordance with the bid procedures (the "Bid Procedures") set forth in this Court's Order granting the Bid Procedures Motion.

      E.      No consents or approvals other than those provided for in the APA are required for CE Pittsfield to consummate the transactions described in the APA.

      F.      CE Pittsfield has demonstrated both: (i) good, sufficient, and sound business purpose and justification for the Sale Transaction; and (ii) compelling circumstances for the Sale Transaction pursuant to § 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization/liquidation.

      G.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities. All objections to the Sale Motion, if any, have either been resolved or overruled.

      H.      The APA was negotiated, proposed, and entered into by CE Pittsfield and the Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither CE Pittsfield, nor the Buyer, has engaged in any conduct that would cause or permit the APA to be avoided under § 363(n) of the Bankruptcy Code.

      I.      The Buyer is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Buyer will be acting in good faith within the meaning of § 363(m) in closing the Sale Transaction.

      J.      The consideration provided by Buyer for the Purchased Assets pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and best offer for the Purchased Assets received by CE Pittsfield, as determined in accordance with the Bid Procedures; (iii) will provide a greater recovery for CE Pittsfield's creditors than would be provided by any other practical available

alternative; and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States and/or the laws of any state of the United States.

K.      The Sale Transaction must be approved and consummated promptly in order to maximize the value of CE Pittsfield's business and assets.

L.      The transfer of the Purchased Assets to Buyer will be a legal, valid, and effective transfer, and will vest Buyer with all right, title, and interest of CE Pittsfield in and to the Purchased Assets, free and clear of all liens, claims, encumbrances and interests: (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of CE Pittsfield's or the Buyer's interest in the Purchased Assets, or any similar rights; and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of CE Pittsfield's business prior to the Closing Date.

M.      The Buyer would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting CE Pittsfield, its estate, and its creditors, if the Sale Transaction, including the assignment of any Selected Permits, were not free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, except those expressly assumed by Buyer in the APA (the "Expressly Assumed Obligations").

N.      CE Pittsfield may sell the Purchased Assets free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those non-debtor parties with interests in the Purchased Assets who did not object, whose objections were accommodated, or who withdrew their objections, to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to §§ 363(f)(2) and 365 (if applicable).  Those non-debtor

parties with interests in the Purchased Assets who did object fall within one or more of the subparagraphs under §§ 363(f) and 365 and are adequately protected by having their interests, if any, attach to the cash proceeds of the Sale Transaction attributable to the Purchased Assets against or in which they claim an interest.

O.    Except for the Expressly Assumed Obligations, the transfer of the Purchased Assets to Buyer, including assignment to Buyer of the Selected Permits, will not subject the Buyer to any liability whatsoever with respect to the operation of CE Pittsfield's business or by reason of such transfer under the laws of the United States or any state of the United States, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of equitable law, antitrust or successor or transferee liability.

P.    CE Pittsfield has demonstrated that it is an exercise of its sound business judgment to assign the Selected Permits to Buyer in connection with the consummation of the Sale Transaction, and the assignment of the Selected Permits, if any, is in the best interests of CE Pittsfield, its estate, and its creditors.  The Selected Permits being assigned to Buyer are an integral part of the Purchased Assets being purchased by Buyer and, accordingly, such assignment of the Selected Permits is reasonable, enhances the value of CE Pittsfield's estate, and does not constitute unfair discrimination.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

## General Provisions

1.    The Sale Motion is granted, as further described herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, accommodated, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

**Compliance with Bid Procedures**

3.      CE Pittsfield has complied with the Bid Procedures and conducted the sale process in accordance therewith.

**Approval of the APA**

4.      The APA and all of the terms and conditions thereof are hereby approved.

5.      Pursuant to § 363(b) of the Bankruptcy Code, CE Pittsfield is authorized to consummate the Sale Transaction in accordance with the terms and conditions of the APA immediately upon entry of this Sale Order.

6.      CE Pittsfield is authorized to execute and deliver, and is empowered to perform under, consummate and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

**Transfer of Purchased Assets to Buyer**

7.      Pursuant to §§ 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to Buyer and, upon consummation of the APA (the "Closing" and the date of the Closing, the "Closing Date"), shall be free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever, other than the Expressly Assumed Obligations, with all such interests of any kind or nature whatsoever to attach to the proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect which they now have against the Purchased Assets.

6

8.    Except as expressly permitted or otherwise specifically provided by the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding interests of any kind or nature whatsoever against or in CE Pittsfield or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to CE Pittsfield, the Purchased Assets, the operation of CE Pittsfield's business prior to the Closing Date, or the transfer of the Purchased Assets to Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting claims of any kind or nature against Buyer, its successors or assigns.

9.    The transfer of the Purchased Assets to Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Purchased Assets, and shall vest Buyer with all right, title, and interest of CE Pittsfield in and to the Purchased Assets, free and clear of all liens, claims, encumbrances and interests of any kind or nature whatsoever.

10.    For the avoidance of doubt, no agreement, licensed software, services, nor other rights of either Oracle Credit Corporation or Oracle America, Inc., including in its capacity as successor in interest to NetSuite, Inc. (jointly here "Oracle"), shall be transferred or assigned to Buyer pursuant to this Sale Order or the APA, in the absence of Oracle's prior consent and following further notice.

11.    Notwithstanding anything else in this Sale Order or otherwise to the contrary:

(a)    Any Purchased Assets that are subject to that certain Lease Agreement, dated on or about December 31, 2002, as amended on or about December 21, 2004 (the "AT&T Lease") with New Cingular Wireless PCS, LLC ("AT&T"), which relates to the

CE Pittsfield facility prior to the Closing shall remain subject thereto on and after the Closing pursuant to the terms of the AT&T Lease;

(b)     Effective upon the Closing, AT&T has elected to and shall retain its rights under the AT&T Lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the Premises, as that term is defined in the AT&T Lease, for the balance of the term of the AT&T Lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law, subject to the terms of the AT&T Lease, to the extent such rights may be retained under 11 U.S.C. § 365(h)(i)(A)(ii);

(c)     Pursuant to Local Bankruptcy Rule 6004-1(c)(1)(B), AT&T is a holder of an interest in a portion of the Purchased Assets which CE Pittsfield seeks to sell authority to sell under this Sale Order;

(d)     The Debtors shall provide written notice to AT&T that the Closing has occurred;

(e)     For the avoidance of doubt, AT&T's rights under the AT&T Lease will continue to encumber a portion of the Purchased Assets for the term (and any renewal or extended term that becomes effective) of the AT&T Lease, subject to the terms of the AT&T Lease, to the extent such rights may be retained under 11 U.S.C. § 365(h)(i)(A)(ii); and

(f)     The AT&T Lease is not treated as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by AT&T, but instead, AT&T retains its rights under the AT&T Lease (including rights such as those relating to the

amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the Premises for the balance of the term of the AT&T Lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law, including without limitation, from and after the sale to the Buyer, subject to the terms of the AT&T Lease, to the extent such rights may be retained under 11 U.S.C. § 365(h)(i)(A)(ii).

12.    No lease with VFS Leasing Co. ("VFS") shall be assigned and assumed pursuant to this Sale Order or the APA, and no assets leased by VFS to the Debtors shall be included in the Purchased Assets or used by the Buyer as part of any agreement related to the APA.  Any assets leased by VFS shall be available to be returned to VFS at the earlier of (i) the Closing Date or (ii) May 25, 2022.

## Assignment of Selected Permits

13.    The assignment of the Selected Permits to Buyer is hereby authorized.  Nothing in this Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

14. CE Pittsfield is hereby authorized and directed in accordance with §§ 105(a) and 365 of the Bankruptcy Code (as applicable) to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Selected Permits to Buyer.

15. The Selected Permits shall be transferred to, and remain in full force and effect for the benefit of, Buyer, in accordance with their respective terms, notwithstanding any provision in any such Selected Permit (including those of the type described in §§ 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to § 365(k) (as applicable), CE Pittsfield shall be relieved from any further liability with respect to any Selected Permits after such assignment to Buyer.

16. Each non-debtor party to any Selected Permit hereby is forever barred, estopped, and permanently enjoined from asserting any claim: (a) against CE Pittsfield or the Buyer for any default existing as of the Closing Date, whether declared or undeclared or known or unknown; or (b) against Buyer, any counterclaim, defense, setoff or any other claim asserted or assertable against CE Pittsfield.

17. The failure of CE Pittsfield or Buyer to enforce at any time one or more terms or conditions of any Selected Permit shall not be a waiver of such terms or conditions, or of Buyer's rights to enforce every term and condition of any Selected Permit.

**Disbursement to Alterna at Closing**

18. Immediately upon Closing, CE Pittsfield shall disburse from the proceeds of the Sale Transaction the amount of **$147,000**, in good and valid funds, to Alterna Capital Solutions LLC ("Alterna"), which such funds Alterna shall immediately apply against the Over-Advance Obligations (as such terms are defined in that certain Amended Invoice Purchase and Security Agreement between the Debtors and Alterna [Dkt. No. 270]) (the "Alterna Disbursement")

**Additional Provisions**

19.     On the Closing Date, each of CE Pittsfield's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its interests in any of the Purchased Assets, if any, as such interests may have been recorded or may otherwise exist.

20.     This Sale Order shall be: (a) effective as a determination that, on the Closing Date, all interests of any kind or nature whatsoever existing with respect to CE Pittsfield or the Purchased Assets prior to the Closing, have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

21.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction.  To the fullest extent permitted by applicable law, the transfers made pursuant to the APA and this Order shall not be taxed under, and shall be exempt from, any law imposing a stamp, sale, transfer, recording or other similar tax imposed by any governmental entity.

22.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests with respect to CE

Pittsfield or the Purchased Assets shall not have delivered to CE Pittsfield prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to Purchased Assets, then CE Pittsfield is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; provided, however, that regardless of whether such persons or entities or CE Pittsfield execute and file any such releases, Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests in the Purchased Assets of any kind or nature whatsoever.

23.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to Buyer on the Closing Date.

24.    Except for the Expressly Assumed Obligations, Buyer shall have no liability or responsibility for any liability or other obligation of CE Pittsfield arising under or relating to the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, Buyer shall not be liable for any claims against CE Pittsfield or any of its predecessors or affiliates, and Buyer shall have no successor or vicarious liabilities of any kind or character, whether known or unknown, as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to CE Pittsfield or any obligations of CE Pittsfield arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of CE Pittsfield's business prior to the Closing Date.

25.     Under no circumstances shall Buyer be deemed a successor of or to CE Pittsfield

for any interest against or in CE Pittsfield or the Purchased Assets of any kind or nature

whatsoever.  Except for the Expressly Assumed Obligations, the sale, transfer, assignment and

delivery of the Purchased Assets shall not be subject to any interests, and interests of any kind or

nature whatsoever shall remain with, and continue to be obligations of, CE Pittsfield.  Except for

persons holding Expressly Assumed Obligations, all persons holding interests against or in CE

Pittsfield or the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever

barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing

such interests of any kind or nature whatsoever against Buyer, its property, its successors and

assigns, or the Purchased Assets with respect to any interest of any kind or nature whatsoever such

person or entity had, has, or may have against CE Pittsfield, its estate, officers, directors,

shareholders, or the Purchased Assets.

26.     This Court retains jurisdiction to enforce and implement the terms and provisions

of the APA, all amendments thereto, any waivers and consents thereunder, and of each of the

agreements executed in connection therewith in all respects, including, but not limited to, retaining

jurisdiction to: (a) compel delivery of the Purchased Assets to Buyer; (b) resolve any disputes

arising under or related to the APA, except as otherwise provided therein; and (c) interpret,

implement, and enforce the provisions of this Sale Order.

27.     Nothing contained in any plan of liquidation confirmed in this Chapter 11 Case or

any order of this Court confirming such plan shall conflict with or derogate from the provisions of

the APA or the terms of this Sale Order.

28.     The transactions contemplated by the APA are undertaken by Buyer in good faith,

as that term is used in § 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification

on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction, unless such authorization is duly stayed pending such appeal. Buyer is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by § 363(m) of the Bankruptcy Code.

29.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, CE Pittsfield, its estate, and its creditors, Buyer, and its respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third-parties including, but not limited to, all persons asserting interests in the Purchased Assets, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

30.     The failure specifically to include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

31.     The APA and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court; provided that any such modification, amendment or supplement does not have a materially adverse effect on CE Pittsfield's estate.

32.     As provided by Bankruptcy Rule 7062, and notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall not be automatically stayed, but shall be effective and enforceable immediately upon signature of this Sale Order.  Time is of the essence in closing the Sale Transaction and CE Pittsfield and Buyer intend to close as soon as possible.  Therefore, any

party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk its appeal being foreclosed as moot.

33.    Any appeal seeking to enjoin or stay consummation of the Sale Transaction ("Appeal") shall be subject to the appellant depositing or posting a bond in an amount equal to the then aggregate Purchase Price, and applicable damages, pending the outcome of the Appeal.

34.    Notwithstanding anything in the Sale Motion or this Sale Order to the contrary, this Sale Order shall be without prejudice to the rights of CE Pittsfield to challenge the claims, liens, mortgages and/or security interests asserted against CE Pittsfield's property by its creditors.

35.    Other than the Alterna Disbursement, the Debtors shall not disburse any proceeds of the Sale Transaction until further order of the Court, entered after notice to the parties.

Dated:    5/6/2022

_____
**The Honorable Elizabeth D. Katz**
**United States Bankruptcy Judge**

## EXHIBIT A

**Purchase Agreement**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of May 5, 2022 (the "Effective Date"), between Community Eco Pittsfield, LLC, a New York limited liability company ("Seller") and Casella Waste Management of Massachusetts, Inc., a Massachusetts corporation or its assignee ("Purchaser" and Purchaser, together with Seller, the "Parties").

## RECITALS

**WHEREAS**, Seller owns certain real estate and improvements and certain personal property and holds various permits and licenses relating to operating a solid waste facility including a waste-to-energy incineration facility and construction and demolition debris (C&D)/recyclables and solid waste transfer operation located at 500 Hubbard Avenue, Pittsfield, Massachusetts; and

**WHEREAS**, on June 25, 2021, Seller filed a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (Western Division) (the "Bankruptcy Court") filed under lead Case No. 21-30234, which Chapter 11 Case is being jointly administered for procedural purposes only with the chapter 11 cases of Community Eco Power, LLC and Community Eco Springfield, LLC; and

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Assets,[1] all in the manner and subject to the terms and conditions set forth herein and in the Sale Order.

**NOW THEREFORE**, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and for other good and valuable consideration, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.  As used in this Agreement, the following terms have the following meanings:

"Agreement" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits attached hereto.

"Assets" shall have the meaning set forth in Section 2.1 of this Agreement.

"Bankruptcy Code" shall have the meaning set forth in the above Recitals.

"Bankruptcy Court" shall have the meaning set forth in the above Recitals.

---

[1] Unless specifically defined when initially used in this Agreement, capitalized terms shall have the meaning ascribed to such terms in Article I of this Agreement.

"Bid Procedures" shall have the meaning set forth in Section 7.1(a) of this Agreement.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in Pittsfield, Massachusetts are closed for business.

"Cell Tower Lease" means that certain lease agreement between Seller and New Cingular Wireless PCS, LLC (f/k/a AT&T Wireless PCS, LLC), dated December 23, 2002, and any subsequent amendments or modifications thereto.

"CEP Closure Process" shall have the meaning set forth in Section 6.1 of this Agreement.

"Chapter 11 Case" shall have the meaning set forth in the above Recitals.

"Claims" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or orders arising under Environmental Laws and any and all claims or rights based on successor, tort and products liability.

"Closing" shall have the meaning set forth in Section 2.6 of this Agreement.

"Closing Conditions" shall mean the conditions to closing set forth in Article VIII hereof.

"Closing Date" shall have the meaning set forth in Section 2.6 of this Agreement.

"Deposit" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"Encumbrance" means any lien, interest, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, condition, restriction, encroachment, rights of first refusal, preemptive right, judgment, conditional sale or other title retention agreements and other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Environmental Laws" shall mean all applicable Laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, indoor air, water, surface water, groundwater, wetlands, sediment, land surface, soil or subsurface) or natural resources (including, without limitation, applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, use of, or release or threatened release into the environment of, any Hazardous Substances).

"Environmental Liabilities" shall mean and include any claims, judgments, damages (including, but not limited to, punitive damages, property damage, and/or natural resource damages), losses, penalties, fines, liabilities (including, but not limited to, liabilities for personal or bodily injury), Encumbrances, violations, responsibilities, costs and expenses (including attorneys' fees) of investigation, remediation, cleanup, corrective action, monitoring, or defense of any matter arising (whether at law or in equity) under any Environmental Laws or in any way

relating to: (i) the environment (including any surface or subsurface physical medium or natural resource such as air, land, soil, wetlands, sediment, surface waters, ground waters, stream and river and biota); (ii) the use, generation, storage, treatment, disposal, processing, transportation, handling, release, emission or remediation of Hazardous Substances; or (iii) impacts on human health and safety resulting from the foregoing, of whatever kind or nature, including, without limitation, noise and odor, by any party, Government Authority or other entity, whether or not resulting from the violation of, or noncompliance with, Environmental Laws.

"Escrow Agent" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"Excluded Assets" shall have the meaning set forth in Section 2.2 of this Agreement.

"Filing Date" shall mean June 25, 2021, the date the Seller commenced the Chapter 11 Case.

"Final Order" shall mean an order of the Bankruptcy Court that has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order has been affirmed by the highest court to which such order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

 "Governmental Authorities" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State.

"Governmental Permits" shall mean and include all licenses, permits, approvals, consents, certificates, waivers, exemptions, orders and other authorizations from any and all Governmental Authorities.

"Hazardous Substance" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, lead, mold, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, perfluoroalkyl and polyfluoroalkyl substances, their precursors and any transformation, breakdown, daughter, co-products, additives or derivative products, carcinogens and oil, petroleum and petroleum products, including, but not limited to, crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of any Assets transferred hereunder to any damages, penalties or liabilities under any applicable Environmental Laws.

"Improvements" shall mean all buildings, fixtures, and structures located on or appurtenant to the Land. For avoidance of doubt, Improvements includes the industrial scale used to weigh waste entering Seller's facility prior to Closing.

"Intangible Property" shall mean the plans and specifications for the Improvements, including, without limitation, as-built plans; warranties, guarantees, indemnities and claims against third parties benefiting Seller; contract rights related to the construction, operation, repair, renovation, ownership or management of the Premises.

"Intellectual Property" shall mean all: (i) trademarks, service marks, trade names, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; and (iv) domain names and URLs used by Seller in the course of its business.

"Land" shall mean, the land described in **Exhibit A** attached hereto and all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining to such land, including any and all mineral rights, development rights, water rights and the like; and all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such land.

"Laws" (and each, a "Law") means all federal, state, provincial, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, Orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Authorities, or court of competent jurisdiction, or other legal requirement or rule of law, including common law.

"Licenses and Permits" shall mean those licenses and permits being assigned to Purchaser by Seller identified on **Schedule 1** hereto.

"LOI" shall mean that certain Letter of Intent Relating to the Purchase of Certain Assets of Community Eco Pittsfield, LLC dated February 8, 2022 by and between Seller and Purchaser.

"MassDEP" means the Massachusetts Department of Environmental Protection.

"Owner's Title Policy" shall have the meaning set forth in Section 8.2(f) of this Agreement.

"Premises" means the Land and Improvements.

"Personal Property" means any and all personal property, including, without limitation, any equipment and furniture, of any kind or nature owned by Seller, including, without limitation, the Intangible Property, and excepting only Licenses and Permits and Excluded Assets.

"Purchase Price" shall have the meaning set forth in Section 2.5 of this Agreement.

"Sale Order" shall mean the order entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1     Purchase and Sale.  Excepting any and all Excluded Assets, upon the terms and subject to the conditions set forth herein, on the Closing Date, Seller shall sell and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to the Premises, the Intellectual Property, and the Licenses and Permits (the "Assets"), in each case free and clear of any Encumbrances, rights, remedies or interests, except as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.  The Personal Property shall not include any Excluded Assets.  The Personal Property shall be transferred and conveyed to Purchaser pursuant to the terms of a Quitclaim Bill of Sale substantially in the form attached hereto as **Exhibit C**.  **The Assets shall not include the Excluded Assets**.

2.2     Excluded Assets.  Notwithstanding anything else to the contrary set forth in this Agreement, the Assets shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "Excluded Assets"):

(a)     Cash, cash equivalents, accounts, accounts receivable, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; and/or any amounts due for the sale of tax credits;

(b)     Any and all causes of action of Seller, whether known or unknown on the Closing Date, including any and all causes of action arising under chapter 5 of the Bankruptcy Code;

(c)     Except as set forth in Section 9.1(b)(viii) solely with respect to damage or destruction of any Assets occurring after the entry of the Sale Order, Seller's rights and interests under any insurance policies;

(d)     Any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements, understandings or other contracts; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(e)     Deposits, including all utility deposits; and

(f)     Any and all additional Excluded Assets identified on **Schedule 2** hereto.

2.3     Assumption and Assignment of Liabilities.  Purchaser shall not assume any liabilities or obligations of Seller, except for those liabilities and obligations assumed in relation to the Licenses and Permits; provided that Purchaser shall not assume any liability or obligations of Seller in relation to Seller's noncompliance with the Licenses and Permits prior to the Closing

Date except as set forth in 16 CMR 19.044(b), and/or to the extent provided for by the terms of the Sale Order.

2.4      Deposit.

(a)      Prior to the Effective Date, Purchaser has delivered, through the Seller, to Chicago Title Insurance Company ("Escrow Agent"), as escrow agent, the sum of Fifty Thousand Dollars ($50,000.00) (the "Deposit").  The Deposit, which shall not accrue interest, shall be credited as a partial payment of the Purchase Price payable at the Closing. The Deposit shall, at all times prior to its release or return in accordance with the terms of this Agreement, be held by Escrow Agent in escrow and shall only be released in accordance with the terms of this Agreement and that certain Escrow Agreement by and among Seller, Purchaser and Escrow Agent, dated as of an even date hereof.  Purchaser shall be responsible for paying the cost of the Escrow Agent.

(b)      In the event that: (i) the Parties terminate this Agreement pursuant to Section 9.1(a); (ii) Purchaser terminates this Agreement pursuant to Section 9.1(b); or (iii) Seller terminates this Agreement pursuant to Section 9.1(c)(i), then the Deposit shall be returned immediately and in full to Purchaser.  If this Agreement is terminated by Seller pursuant to Section 9.1(c)(ii), then the Deposit shall be delivered immediately to Seller. Delivery of the Deposit to Seller in accordance with the foregoing shall not constitute full compensation of any and all losses and expenses incurred by Seller, shall not constitute liquidated damages, and Seller reserves the right to pursue any and all other remedies available at law or equity.

2.5      Purchase Price.  The purchase price for the Assets (the "Purchase Price") shall consist of: (a) Five Million Dollars ($5,000,000.00), in cash or by means of a completed federal funds wire transfer to an account or accounts designated by Seller in writing not later than three (3) business days prior to the Closing Date; (b) waiver by Purchaser of any expense reimbursement and/or administrative expense claim against Seller's estate related to the costs and expenses incurred by Purchaser during the sale process, including without limitation during the period after the initial April 1, 2022 bid deadline and the initial May 3, 2022 sale hearing; and (c) the assumption by Purchaser, if any, of the liabilities and obligations set forth in Section 2.3 hereof, if any, provided that the Purchase Price shall be subject to all prorations and adjustments set forth in this Agreement, including without limitation those set forth in Section 8.7.  Except as otherwise specified herein, the term "Dollars" or "$" as used in this Agreement refers to United States Dollars.

2.6      Closing.  The closing (the "Closing") shall occur at a date and time mutually agreeable between Purchaser and Seller that is on or before the Outside Closing Date (defined below), provided the Sale Order has been entered by the Bankruptcy Court.  The Closing shall be an escrow-style closing through Escrow Agent.  Seller and Purchaser shall, no later than 5:00 P.M. (Pittsfield, Massachusetts, time) on the business day immediately preceding Closing, each deliver to Escrow Agent all documents, agreements, instruments, certificates, payments and other items required to be delivered by such party in connection with the transaction contemplated by this Agreement to be held in escrow pending consummation of the Closing on the Closing Date. Notwithstanding the foregoing, Purchaser shall deliver to Escrow Agent the balance of the

Purchase Price no later than 12:00 P.M. (Pittsfield, Massachusetts, time) on the on the date of Closing (the "Closing Date").

2.7    As Is/Where Is.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Encumbrances, rights and interests, including any and all express and implied warranties of any kind or nature, except as specifically set forth herein, and as approved for sale, transfer and assignment pursuant and subject to the Sale Order.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to Purchaser as follows, conditioned upon and subject to the entry of the Sale Order:

3.1    Organization and Authority.  Seller is duly organized and validly existing under the Laws of the jurisdiction of its organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable Governmental Authorities, has the power and authority to enter into the transactions contemplated by this Agreement.

3.2    Authority and Binding Agreement.  This Agreement has been duly authorized, executed and delivered by Seller and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Seller.

3.3    Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Authorities is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer Seller's interest in any Assets, the title to which is governed by filing in the public records; (c) the filing of such documents as may be necessary to reflect the release of any Encumbrances that are a matter of public record; and (d) any consents, approvals, or authorizations of any Governmental Authority, which consents, approvals or authorizations are identified on **Schedule 3** hereto.

3.4    Title to and Condition of Assets.  Seller has good title to the Assets and may transfer the Assets free and clear of all liabilities, Encumbrances (including tax liens and environmental liens), rights and interests of any kind whatsoever, all to the extent provided for by the terms of this Agreement and the Sale Order.

3.5    Utilities.  All water, sewer, electric, gas, telephone, and drainage facilities, and all other utilities required by Law or for the normal operation of the Premises are installed to the property lines of the Premises and Seller has received no notices that service will be disconnected or reduced.

3.6    Rights in Others.  Excepting the rights of Crane & Co., Inc. ("Crane") under that certain Steam Purchase Agreement, dated on or about January 1, 2021 (as may have been amended

from time to time) and AT&T Wireless PCS, LLC ("<u>AT&T</u>") under that certain Lease Agreement, dated on or about December 31, 2002 (as may have been amended from time to time), which agreements and/or leases has been rejected by Seller, no person or other entity has any right or option to acquire, lease or occupy all or any portion of the Premises or otherwise acquire an interest in the Premises.

3.7     <u>Service Contracts</u>.   There are no service, maintenance, repair, management, leasing, construction, or supply contracts or other contract affecting all or any portion of the Premises which will be binding upon Purchaser after Closing.

3.8     <u>Documents</u>. Seller has delivered to Purchaser true, correct and complete originals or copies written materials in Seller's possession or control which contain information or disclose facts or conditions that would have a material adverse impact on the use, operation or marketability of the Premises.

3.9     <u>Compliance with Law</u>.   Except as set forth in **<u>Schedule 4</u>**, Seller has not received any written notice that the Premises or any portion thereof are in violation of any Environmental Law or any zoning, building, health, traffic, environmental, flood control or other applicable Laws of any local, state and federal authorities or any other governmental entity having jurisdiction over the Premises.

3.10     <u>Condemnation; Zoning</u>. Seller has not received any written notice of any pending material condemnation action, zoning action or similar proceeding being undertaken by any Governmental Authority relating to the Premises or any portion thereof.

3.11     <u>Litigation</u>.   Other than the Sale Order and the transfer and/or issuance of Licenses and Permits required in relation hereto, there is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Authority pending, or, to the knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.   Other than the Sale Order and the transfer and/or issuance of Licenses and Permits required in relation hereto, as of the date hereof, to Seller's knowledge, there are no circumstances or facts that would prevent Seller from engaging in the transactions contemplated in this Agreement.

3.12     <u>Environmental Matters</u>.

(a)     Except as disclosed in **<u>Schedule 5</u>** hereto, Seller is in compliance with and has no liability under Environmental Laws and has no Environmental Liabilities.

(b)     Except as disclosed in **<u>Schedule 5</u>**, and without limiting the generality of the foregoing, Seller holds and is in compliance with all permits, licenses and other authorizations that are required pursuant to Environmental Laws, and all such authorizations have been validly issued and are currently in full force and effect.

(c)     Seller has complied or will have complied by the Closing with all applicable consent or notice requirements under Environmental Laws relating to the lawful transfer to Purchaser of such authorizations.   A list of all such authorizations is included in **<u>Schedule 3</u>** hereto.

(d)     Except as described in **Schedule 5** hereto, there is no civil, administrative, or criminal proceeding pending or, to Seller's knowledge, threatened against Seller: (i) under any Environmental Laws; or (ii) to revoke, suspend, adversely modify or terminate any of the Licenses and Permits or declare any of the Licenses and Permits invalid.

(e)     No release or threatened release of Hazardous Substances has occurred or is occurring at or from the Premises which requires notice, further investigation or any form of response action under any Environmental Law, or which would give rise to Environmental Liabilities.

(f)     Seller has not caused any substance (including, without limitation, Hazardous Substances) to be treated, stored, disposed of, transported, handled, released or posed a threat of release in a manner that has given or would give rise to Environmental Liabilities.

(g)     Seller has produced true and complete copies of any audits, notices, inspection reports, correspondence, or complaints concerning compliance or noncompliance of Seller with Environmental Laws, and any environmental reports, assessments, test results, or studies related to the Premises.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

4.1     <u>Organization and Authority</u>.  Purchaser is duly organized and validly existing under the Laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of all Governmental Authorities to enter into the transactions contemplated by this Agreement.  Purchaser is duly qualified to do business in each jurisdiction where Purchaser does business.

4.2     <u>Authority and Binding Agreement</u>.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser.

4.3     <u>Consents and Approvals</u>.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer Seller's interests in any Assets, the title to which is governed by filing in the public records; (c) consents and approvals necessary to transfer the Licenses and Permits being transferred to Purchaser hereunder; and (d) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a material adverse effect on the transactions contemplated in this Agreement; and (e) any consents, approvals, or authorizations of any Governmental Authority identified on **Schedule 3** hereto.

4.4    <u>Litigation</u>.  There is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Authority pending, or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement, subject to entry of the Sale Order.

4.5    <u>WHERE-IS/AS-IS</u>.  Purchaser acknowledges, represents and warrants to Seller that Purchaser has not been induced to execute this Agreement by any act, statement or representation of Seller or its agents, employees or other representatives not expressly set forth in this Agreement.

4.6    <u>Financing</u>.  At the Closing, Purchaser shall have sufficient immediately available funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement, the other agreements contemplated herein, and the transactions contemplated herein and thereby.  Upon the consummation of the transactions contemplated herein, Purchaser shall not be insolvent, be left with unreasonably small capital, or have incurred debts beyond its ability to pay such debts as they mature.

**ARTICLE V**
**<u>COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING</u>**

5.1    <u>Affirmative and Negative Covenants Pending Closing</u>.  Except as expressly set forth below, during the period from the date hereof to the Closing Date:

(a)    Seller's Covenants.

(i)    <u>Affirmative Covenants Pending Closing</u>.  Seller covenants and agrees that Seller shall, unless otherwise agreed to in writing by Purchaser:

(1)    <u>Maintenance</u>.  Maintain the Assets owned or operated by Seller consistent with Seller's standard practice, subject only to ordinary wear and tear, provided, however, certain maintenance and repairs relating to operating Seller's facility as a waste-to-energy facility may not be performed in light of the anticipated decommissioning of the waste-to-energy facility.

(2)    <u>Court Orders</u>.  Subject to the provisions hereof and the Bid Procedures, in consultation with Purchaser, use Seller's reasonable best efforts to secure all required approvals from the Bankruptcy Court for the sale of the Assets pursuant to the terms hereof, and shall otherwise use Seller's best efforts to cause the consummation of the transactions contemplated by this Agreement in accordance with the terms and conditions hereof.

(3)    <u>Notification of Certain Matters</u>.  To the extent not prohibited by Law, Seller shall immediately notify Purchaser of: (i) any material adverse change relating to the Assets or the value or use thereof; (ii) any

governmental or third party complaint, investigation or hearing (or communications indicating that any are contemplated); and (iii) any environmental enforcement actions, rulings or orders under any applicable Environmental Laws, including, without limitation, any remediation or clean-up orders, issued with respect to either the Seller or the Assets.

(4)    Phase II Environmental Site Assessment.  In the event that a Phase II environmental site assessment is deemed reasonably necessary as a result of a Phase I environmental site assessment completed prior to the Closing, and a Phase II environmental site assessment is completed by Purchaser prior to the Closing, Seller shall not be liable to Purchaser for the cost of conducting the Phase II environmental site assessment.

(ii)    Negative Covenants Pending Closing.  Except as expressly permitted herein, or as required by Law, subject to the limitations of the Bankruptcy Code or as provided for by the terms of any order entered by the Bankruptcy Court, without the consent of Purchaser, Seller will not:

(1)    directly or indirectly sell, assign or create any right, title or interest whatsoever in or to the Assets or any portion thereof, (b) take any action, create, commit, permit to exist or suffer any acts which would (i) give rise to a variance from the current legal description of the Land, or (ii) cause the creation of any Encumbrance, or (c) enter into any agreement to do any of the foregoing without Purchaser's prior written consent (which consent may be withheld in Purchaser's sole and absolute discretion);

(2)    abandon or permit to lapse any rights to the Assets, or enter into any settlement regarding the breach or infringement, misappropriation, dilution or other violation of, or challenge the title to, any such Assets; or

(b)    Purchaser's Covenants.  Purchaser agrees that it shall use its good faith efforts to take, or cause to be taken, all actions reasonably requested by Seller to assist in obtaining entry of the Sale Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court.

5.2    Consents and Further Actions.  Subject to the terms and conditions herein provided, Seller and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated in this Agreement, including all closing conditions to be satisfied.  This Section 5.2 shall survive until fully performed or until such performance is expressly waived in writing by the other Party.

5.3    Tax Cooperation and Exchange of Information.  Each Party hereto shall provide the other Party with such cooperation and information as may be reasonably requested in filing any tax return, amended tax return, or claim for refund, determining any liabilities for taxes or a right to refund of taxes, or participating in or conducting any audit or other proceeding with respect to taxes relating to the transactions contemplated hereby.  Such cooperation and information shall

include providing copies of relevant tax returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.

5.4     Public Announcement.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby.  Except as may be required by applicable Law or the Bankruptcy Court, the Parties shall not cause or permit the issuance of any such release or any such public statement without the consent of all of the Parties hereto, which consent shall not be unreasonably withheld or delayed.

## ARTICLE VI
## DECOMMISSIONING AND CLOSURE

6.1     Decommissioning and Closure.

(a)     Purchaser shall be solely responsible for all costs and expenses associated with, and shall complete, the decommissioning and closure of the waste-to-energy facility on the Premises, including to the extent required by the MassDEP.  Decommissioning and closure of the waste-to-energy facility shall occur substantially in the manner set forth in the LOI or as otherwise required by the MassDEP (the "CEP Closure Process").  The CEP Closure Process shall occur after the Closing Date.

(b)     Purchaser is also solely responsible for the costs and expenses relating to the post-CEP Closure Process demolition of the facility.

(c)     Contemporaneously with execution of this Agreement, Seller and Purchaser shall enter into that certain Temporary Operating, Transportation & Disposal Agreement in the form attached hereto as **Exhibit F**.

## ARTICLE VII
## BID AND AUCTION PROCESS

7.1     Court Actions.

(a)     Seller has filed with the Bankruptcy Court and shall prosecute in good faith, all such necessary motions or applications seeking approval of this Agreement, subject to higher and better offers, in accordance with the bid procedures order entered by the Bankruptcy Court (the "Bid Procedures").

(b)     Seller shall comply (or obtain an order from a competent court waiving compliance) with all applicable Laws including, without limitation, requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of procedure of the Bankruptcy Court.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO CLOSING**

8.1    <u>Conditions to Seller's Obligation to Close</u>.  Seller's obligation to consummate the transactions contemplated in this Agreement is subject to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part to the extent permitted by applicable Law):

(a)    <u>Representations and Warranties; Covenants</u>.

(i)    Purchaser shall have performed in all material respects all agreements and covenants required hereby to be performed by Purchaser prior to or at the Closing Date, and all representations and warranties of Purchaser contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which will be true and correct as of such date), and Purchaser shall have delivered to Seller a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(ii)    Purchaser shall have performed, in all material respects, all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and Seller shall have received a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(b)    <u>No Injunction</u>.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)    <u>Bid Procedures Order</u>.  The Bid Procedures Order shall have become a Final Order (except as modified or amended in any immaterial respect or with the consent of Purchaser, which consent may be withheld in its reasonable discretion for material modifications and amendments).

(d)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order which Sale Order shall authorize the sale of the Assets free and clear of all Encumbrances (including without limitation by specific reference to all filed security interests), excepting Encumbrances arising out of the language requested by the MassDEP and added to the Sale Order, and excepting Encumbrances arising from the Cell Tower Lease to the extent set forth in the Sale Order, and otherwise be in form and substance acceptable to Purchaser in its sole discretion (except as modified or amended in any immaterial respect or with the consent of Purchaser, which consent may be withheld in its sole discretion for material modifications and amendments).

(e)    <u>Purchaser's Deliveries</u>.  Purchaser shall have paid the Purchase Price (and any other amounts due hereunder, if any) and shall have duly executed and delivered to

Seller each of the documents, instruments and agreements required to be delivered pursuant to this Agreement.

(f)    Governmental Permits.  All Governmental Permits, authorizations and/or exemptions required to be obtained in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

8.2    Conditions to Purchaser's Obligation to Close.  Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part to the extent permitted by applicable Law):

(a)    Representations and Warranties; Covenants.

(i)    Seller shall have performed in all material respects all agreements and covenants required hereby to be performed by Seller prior to or at the Closing Date, and all representations and warranties of Seller contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which will be true and correct as of such date), and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

(ii)    Seller shall have performed, in all material respects, all agreements and covenants required by this Agreement to be performed by Seller prior to or at the Closing Date, and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

(iii)    Seller shall have resolved, in all material respects and to Purchaser's reasonable satisfaction, the matters described in **Schedule 5** hereto, and such resolution shall impose no liabilities or obligations on Purchaser.

(iv)    Seller shall have recorded a "Notice of Solid Waste Facility" in the Berkshire County registry of deeds containing a title reference citing the source of title of the Land.

(b)    Seller's Deliveries.  Seller shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by Seller pursuant to this Agreement.

(c)    Material Adverse Change.  No material adverse change with respect to the physical or environmental condition of the Premises or any Law applicable to the Assets

or Purchaser's intended use thereof, shall have occurred between the Effective Date and the Closing.

(d)      Bid Procedures Order.  The Bid Procedures Order shall have become a Final Order (except as modified or amended in any immaterial respect or with the consent of Purchaser, which consent may be withheld in its reasonable discretion for material modifications and amendments).

(e)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order which Sale Order shall authorize the sale of the Assets free and clear of all Encumbrances (including without limitation by specific reference to all filed security interests), excepting Encumbrances arising out of the language requested by the MassDEP and added to the Sale Order, excepting Encumbrances arising from the Cell Tower Lease to the extent set forth in the Sale Order, and otherwise be in form and substance acceptable to Purchaser in its sole discretion (except as modified or amended in any immaterial respect or with the consent of Purchaser, which consent may be withheld in its sole discretion for material modifications and amendments).

(f)      No Injunction or Challenge.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No Law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Authority or any other person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation of the transaction at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

(g)      Title Policy.  Escrow Agent, acting as title insurer, shall be prepared and irrevocably committed to issue to Purchaser an American Land Title Association extended coverage owner's policy of title insurance – 2006 in favor of Purchaser showing indefeasible fee simple title to the Property vested in Purchaser, with those additional endorsements and reinsurance reasonably requested by Purchaser, in a form and substance acceptable to Purchaser (the "Owner's Title Policy").

(h)      Authorization to Operate.  Purchaser shall have received agreement from MassDEP, the Pittsfield Board of Health, and any other Governmental Authority with jurisdiction to authorize Purchaser to transfer (for off-site disposal at permitted disposal facilities) up to 101,885 tons of solid waste in any calendar year, from the Premises, pursuant to terms and conditions reasonably acceptable to Purchaser and confirmation from MassDEP that the facility's air operating permit has been terminated.

(i)      No MassDEP Objection.  MassDEP shall not have objected to the Sale, or if MassDEP has objected to the Sale, such objection shall have been overruled or resolved to the satisfaction of Purchaser sufficiently in advance of the Closing Date in Purchaser's sole discretion.

8.3      Access to Information.

(a)      Seller agrees that, between the date this Agreement is executed and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 9.1, Purchaser shall be entitled, through its representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties (including, but not limited to, the Premises), businesses, assets, accountants, auditors, counsel and operations of Seller as Purchaser may reasonably request, provided, however, that Seller shall not be obligated to provide information that it is not permitted to provide under applicable Law.   Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including Seller's right to have its representatives accompany Purchaser and its representatives at the time of any on-site inspection or examination and shall be subject to restrictions under applicable Law. Pursuant to this Section 8.3, Seller shall furnish to Purchaser and its representatives such financial, operating and property related data and other information as such persons reasonably request.    Seller shall use commercially reasonable efforts to cause its representatives to reasonably cooperate with Purchaser and Purchaser's representatives in connection with such investigations and examinations.   Purchaser and its representatives shall be permitted to contact, or engage in discussions or otherwise communicate with Seller's landlords, clients, suppliers and other Persons with which Seller has material commercial dealings, provided, that Purchaser must obtain the prior written consent of Seller, which written consent shall not be unreasonably withheld or delayed, to initiate such communications and give Seller the opportunity to be present therefor.

(b)      No information received pursuant to an investigation made under this Section 8.3 shall be deemed to: (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Seller or Purchaser set forth in this Agreement or any certificate or other instrument delivered to Purchaser in connection with the transactions contemplated hereby; (ii) limit or restrict the remedies available to the Parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity; or (iii) limit or restrict the ability of either Party to invoke or rely on the conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement set forth in Article VIII.

(c)      From and after the Closing Date, upon reasonable request by Seller, Purchaser will provide Seller with copies of all books and records that comprise or are related to the Assets for the purposes of: (a) preparing any tax returns; (b) enforcing rights or obligations of Seller under this Agreement; or (c) complying with the requirements of, or responding to inquiries by, any Governmental Units; provided, however, that, for the avoidance of doubt, the foregoing shall not require Purchaser to take any such action if: (i) such action may result in a waiver or breach of any attorney/client privilege; or (ii) such action could reasonably be expected to result in violation of applicable Law or Order. Purchaser agrees to maintain the files or records which are contemplated by this Agreement for two (2) years following the Closing.

8.4      Deliveries at Closing.

(a)    <u>Deliveries by Seller</u>.  Not less than two days prior to the Closing Date, Seller, at its sole cost and expense, shall deliver or cause to be delivered to Escrow Agent the following documents and instruments, each effective as of the Closing Date and executed by Seller, in addition to the other items required by this Agreement to be delivered by Seller:

(i)    a certified copy of the Sale Order;

(ii)    The Quitclaim Deed to the Premises substantially in the form attached hereto as **Exhibit B** and the Quitclaim Bill of Sale substantially in the form attached hereto as **Exhibit C**;

(iii)    A written waiver by (i) Seller; (ii) Community Eco Power, LLC; and (iii) Community Eco Springfield, LLC releasing any and all claims against Purchaser arising under chapter 5 of the Bankruptcy Code, which written waiver shall be in the form attached hereto as **Exhibit D**;

(iv)    any applicable local, state or federal transfer tax forms;

(v)    all other documents, closing statements, affidavits, instruments, evidence of authority, and writings required by Seller or the Title Company pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Encumbrances, rights or interests, each in form and substance reasonably satisfactory to Purchaser and Seller, and as are necessary for the Escrow Agent to issue the Owner's Policy;

(vi)    two (2) originals of the Non-Foreign Affidavit in the form of **Exhibit E** attached hereto, each executed by Seller;

(vii)    A title affidavit with a gap indemnity in form and substance reasonably satisfactory to Escrow Agent and Purchaser, executed and acknowledged by Seller;

(viii)    A duly executed counterpart of the settlement statement prepared by Escrow Agent, setting forth the Purchase Price and the apportionments and adjustments required pursuant to this Agreement (the "<u>Settlement Statement</u>");

(ix)    Bringdown certificates of Seller as required by this Agreement, executed by a duly authorized officer of Seller, in a form reasonably satisfactory to Purchaser;

(x)    Proof that notice that the solid waste facility is operating or was operated has been recorded in the Berkshire County registry of deeds;

(xi)    A letter to MassDEP and any other necessary party or Governmental Authority certifying that Seller will transfer its authorization to operate the solid waste facility, and all other Licenses and Permits, to Purchaser on

the Closing Date, and requesting that MassDEP terminate the facility's air operating permit; and

(xii)   Certificates of compliance from the Pittsfield Conservation Commission for all work regulated by Orders of Conditions recorded in the Berkshire County Registry of Deeds at (1) Book 2251, Page 172 (DEP File Number 263-741); (2) Book 2359, Page 144 (MassDEP File Number 263-748); and (3) Book 3383, Page 224 (MassDEP File Number 263-842).

(b)   Deliveries by Purchaser.  Not less than two days prior to the Closing Date, Purchaser, at its sole cost and expense, shall deliver or cause to be delivered into escrow the following documents and instruments, each effective as of the Closing Date and executed by Purchaser, in addition to the other items and payments required by this Agreement to be delivered by Purchaser:

(i)   the Purchase Price (and any other amounts due hereunder, if any) less the Deposit, in cash or by means of a completed federal funds wire transfer, provided that notwithstanding the foregoing requirements of Section 8.4(b), shall deliver to Escrow Agent the balance of the Purchase Price no later than 12:00 P.M. (Pittsfield, Massachusetts, time) on the on the date of Closing Date, but not prior;

(ii)   a duly executed counterpart of the Settlement Statement;

(iii)   All other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in form and substance reasonably satisfactory to Purchaser and Seller.

8.5   Possession.  On the Closing Date, possession of the Assets shall be delivered to Purchaser with possession meaning providing access to Purchaser to the Premises.

8.6   Closing Costs.  Except as hereinafter specifically provided, Seller and Purchaser shall allocate all closing costs between them in accordance with standard practice in Pittsfield, Massachusetts. Seller and Purchaser shall each be responsible for preparing such documents as it is obligated to deliver pursuant to Article 5 hereof and for its own legal expenses. Seller and Purchaser agree to allocate closing costs as follows:

(a)   All transfer taxes, Massachusetts deed excise taxes, sales taxes and similar charges, if any, applicable to the transfer of the Assets to Purchaser shall be paid by Purchaser.

(b)   The cost of the Title Commitment and the Owner's Policy, including any premium for extended coverage, and Purchaser's Endorsements, shall be paid by Purchaser.

(c)   The cost of recordation of the Deed shall be paid by Purchaser.

(d)      Each of Seller and Purchaser shall pay their own legal fees.

(e)      Escrow and closing fees charged by Title Insurer for conducting the Closing shall be paid by Purchaser.

(f)       The cost of the Owner's Policy, including any premium for extended coverage, and any endorsements thereto, shall be paid by Purchaser.

(g)      Other costs associated with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in this Agreement.  Seller shall request that the Bankruptcy Court waive all transfer, stamp and other transfer taxes due and owing as result of transfer of Assets from Seller to Purchaser.  Purchaser agrees to be bound by the Bankruptcy Court's ruling on this request.

8.7     <u>Expenses</u>.   Taxes, assessments, improvement bonds, utility costs, and other expenses affecting the Premises shall be prorated between Purchaser and Seller as of the Closing Date to the extent due and payable for any period prior to the Closing.  All non-delinquent real estate taxes or assessments on the Premises shall be prorated based on the actual current tax bill, but if such tax bill has not yet been received by Seller by the Closing Date or if supplemental taxes are assessed after the Closing for the period prior to the Closing, the Parties shall use their best efforts to approximate the total cost of taxes, and the Parties' determination shall be deemed final as of the Closing Date.  The terms of this Section 8.7 shall survive Closing.

## ARTICLE IX
## <u>TERMINATION</u>

9.1     <u>Termination</u>.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned, and there shall thereafter be no liability of any Party to the other Party hereunder, as follows:

(a)      <u>Mutual Consent</u>.  Upon the mutual written consent of Seller and Purchaser.

(b)      <u>By Purchaser</u>.

(i)      By Purchaser, in the event of a material violation or material breach by Seller of Seller's agreements, covenants, representations or warranties contained in this Agreement and, to the extent such breach is reasonably capable of cure within such period, such breach has not been cured by Seller within ten (10) Business Days after written notification by Purchaser; or

(ii)      By Purchaser, in the event that any Phase I or Phase II environmental site assessment of the Premises conducted on or before May 9, 2022 (or on such other extended date upon which the Parties mutually agree in writing) documents conditions that (x) were unknown to Purchaser as of the Effective Date of this Agreement and (y) are deemed unacceptable to Purchaser, in Purchaser's sole discretion; or

(iii)      By Purchaser, in the event that any title report or survey received by Purchaser on before May 9, 2022 (or on such other extended date upon which the Parties mutually agree in writing) reveals conditions that are deemed unacceptable to Purchaser, in Purchaser's sole discretion; or

(iv)      by Purchaser, if the Bankruptcy Court enters an order granting stay relief with respect to any material portion of the Assets; or

(v)      [Intentionally Omitted]; or

(vi)      By Purchaser, if the Sale Order which Sale Order shall authorize the sale of the Assets free and clear of all Encumbrances (including without limitation by specific reference to all filed security interests, and excluding any Encumbrances arising from the Cell Tower Lease) and otherwise be in form and substance acceptable to Purchaser in its sole discretion, is not entered by the Bankruptcy Court on or before May 6, 2022; or

(vii)      By Seller or Purchaser, if the Closing does not occur on or before May 13, 2022 (or on such other extended date upon which the Parties mutually agree in writing) (the "Outside Closing Date"); or

(viii)      By Purchaser if, prior to the Closing, a material amount of the Assets (or any portion material to Purchaser's use thereof) are destroyed or substantially damaged by fire, explosion, act of God, collapse or other casualty; provided, however, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Seller on account of such loss shall be transferred to Purchaser; or

(ix)      By Purchaser if, prior to the Closing, a material amount of the Assets (or any portion material to Purchaser's use thereof) are taken by eminent domain or conveyed by deed in lieu thereof; or

(c)      By Seller.

(i)      By Seller in the event that a higher or better offer is received and accepted by Seller, approved by the Bankruptcy Court, and results in the closing of such transaction, in which event this Agreement shall be deemed, without further action, to have been automatically terminated by Seller on the date of the approval of such sale by the Bankruptcy Court.  In such event, the Deposit shall be returned to Purchaser in accordance with Section 2.4(b) hereof; or

(ii)      By Seller, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Seller, and provided further that Purchaser is not then in material breach of the Agreement.

(iii)       By Seller, in the event that Seller is unwilling to fund remediation required based on the results of any Phase I or Phase II environmental site assessment of the Premises conducted on or before May 9, 2022 (or on such other extended date upon which the Parties mutually agree in writing).

(d)       Effect of Termination.  In the event of valid termination of this Agreement pursuant to this Section 9.1, written notice thereof shall forthwith be given to the other Party, and all further obligations of the Parties hereunder shall immediately and without further action terminate, except that the obligations set forth in Section 2.4 shall survive in full force and effect, as shall any other provisions of this Agreement which are specifically designated to survive termination, provided, however, that if this Agreement is terminated by a Party because of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies for breach of contract or otherwise, including, without limitation, specific performance and damages relating thereto, shall also survive such termination unimpaired.  Subject to Section 2.4 hereof, but notwithstanding anything herein otherwise to the contrary, to the extent the Agreement is terminated by Purchaser for any reason, other than a knowing and willful breach by Seller, Purchaser's remedies shall be limited solely to the return of the Deposit.

## ARTICLE X
## MISCELLANEOUS

10.1    Entire Agreement.  This Agreement, the LOI, the Schedules, the Exhibits and the Sale Order, together with the non-disclosure agreement previously executed and delivered by Purchaser, contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

10.2    Other Governmental Authorities.  In the event any Party receives notice from any Governmental Authority that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Seller shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

10.3    Additional Actions and Documents.  At and after the Closing, and without further consideration, Purchaser and/or Seller (as applicable) shall promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions as any Party may reasonably request in order to convey, assign and transfer to Purchaser all of Seller's rights, title and interest in and to the Assets, or to clarify, identify or more precisely describe the Assets intended to be conveyed.

10.4    RESERVED.

10.5    Descriptive Headings; Certain Interpretations.

(a)       Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement:  (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" are not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a person includes a natural person or entity and its permitted successors and assigns; and (v) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

10.6    <u>Successors and Assigns</u>.  This Agreement is made solely and specifically by and for the benefit of the Parties, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser; provided, however, that such assignment shall not relieve Purchaser of its obligations hereunder.

10.7    <u>Notices</u>.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered via electronic mail and/or by overnight courier to the Parties at the following addresses and electronic mail addresses below:

If to Seller, addressed to:

Richard Fish
34 Wordsworth Road
Black Mountain, NC 28711
Email: rfish@cecopower.com

With copies (which shall not constitute notice hereunder) to:

D. Sam Anderson, Esq.
Bernstein Shur
100 Middle Street
Portland, ME 04104-5029
(207) 228-7178
Email:  sanderson@bernsteinshur.com

If to Purchaser, addressed to:

Shelley E. Sayward
Casella Waste Systems, Inc.
25 Greens Hill Lane
Rutland, VT 05701
(802) 772-2215
Email: shelley.sayward@casella.com

With a copy to (which shall not constitute notice hereunder to):

Jeffrey A. Stein

George W. Shuster, Jr.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526 6624
(617) 526-6572
Email: jeff.stein@wilmerhale.com
        george.shuster@wilmerhale.com

All such Notices shall be deemed given one Business Day after delivery by overnight courier or by electronic mail.  Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

10.8    Expenses.  Except as otherwise expressly provided herein, each Party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such Party's compliance with all its agreements and conditions contained herein, including, without limitation, all legal and accounting fees and disbursements and all costs of obtaining necessary consents.  The provisions of this Section 10.8 shall survive the Closing or earlier termination of this Agreement.

10.9    Brokerage Commissions and Fees.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection with the transactions contemplated by this Agreement and Purchaser agrees that should any claim be made for commissions or fees by any broker against Seller, Purchaser shall indemnify and hold Seller harmless from and against any and all such claims in connection therewith.  Seller warrants and represents that no brokerage commissions or fees are due to any brokers and Seller agrees that Seller shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith.  Notwithstanding anything contained herein to the contrary, the provisions of this Section 10.9 shall survive the Closing or any earlier termination of this Agreement.

10.10    Waiver.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the Party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the Party granting such waiver.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  Notwithstanding the foregoing, a waiver hereunder by Seller of any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

10.11    Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

10.12   Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

10.13   Continuing Jurisdiction.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

10.14   Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the Laws of the Commonwealth of Massachusetts, without regard to conflicts of law principles thereof, except with respect to matters of Law concerning the internal corporate affairs of any corporation, company or limited liability company that is a party to or the subject of this Agreement, and as to those matters the Law of the jurisdiction of incorporation or organization of such entity shall govern.

10.15   No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

10.16   No Third-Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no person or entity other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

10.17   Prevailing Agreement Between the Parties.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the Parties as between themselves.  In the event of any conflict between any provision of this Agreement and the Sale Order, the terms of the Sale Order shall govern.

*[Signature page follows.]*

DocuSign Envelope ID: 7185121A-6841-400F-98E9-D498925CDA07

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

COMMUNITY ECO PITTSFIELD, LLC

By: _Richard Fish_____

Name:  Richard Fish

Title:  Chief Executive Officer


CASELLA WASTE MANAGEMENT OF MASSACHUSETTS, INC.

By:_____

Name:

Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

COMMUNITY ECO PITTSFIELD, LLC

By:_____
Name:  Richard Fish
Title:  Chief Executive Officer

CASELLA WASTE MANAGEMENT OF MASSACHUSETTS, INC.

By:_____
Name:  John W. Casella
Title:  President & Clerk

## **SCHEDULE 1**

## **LICENSES AND PERMITS**

- Massachusetts Department of Environmental Protection, Authorization to Operate.

- City of Pittsfield Sewer Discharge Permit, DPU #98040101.

- City of Pittsfield Solid Waste Facility Site Assignment Permit.

- BWP SW 40 - Beneficial Use Determination, Processed Bottom Ash, Transmittal No. W119501, 07-236-007 (issued by MassDEP April 13, 2007).

## SCHEDULE 2

## EXCLUDED ASSETS

| Quantity | Description |
|---|---|
| | **Filters** |
| 1 | Air Filter - Baldwin PA 2001 Carbon Injection |
| 1 | Air Filter - Baldwin RS35550 Purge Air Soot Blowers |
| 1 | Air Filter - Baldwin PA 2546 Air Compressors |
| 1 | Air Filter - Baldwin Air Handler 20x20x2 Heavy Duty |
| 1 | #GW744 MERV 6 Control and Maintenance (office ceilings) |
| 1 | Air Filter Air Handler 20x20x2 Medium Duty |
| 1 | #6B885 Control and Maintenance (office ceilings) |
| 1 | Air Filter Air Handler 12x24x4 T #4YUZ1 |
| 1 | Air Filter Air Handler 16x25x1 Cabinets MMC Room #1MBE1 |
| 1 | Air Filter Air Handler 20x25x1 MCC Air Handler #6B931 |
| 1 | Air Filter Quincy #2013400453 Control Air Compressor Exterior by #2ID fan |
| 1 | Air Filter Air Handler 20x25x2 application unknown #2EKF9 |
| 1 | Air Filter Air Handler 18x24x2 application unknown #2EKJ3 |
| 1 | Air Filter Air Handler 20x20x1 application unknown #1LC876 |
| 1 | 6' lengths pipe insulation 1 3/8 |
| | **Lighting** |
| 2 | 4' LED High Bay Lights (Lithonia Lighting) |
| 2 | 2' LED High Bay Lights (Lithonia Lighting) |
| 2 | 16" Round Flood Lights (Dialight) |
| 1 | 14" Square Wall Mount Flood (Lithonia Lighting) |
| | **Miscellaneous** |
| 1 | 5"x10' DIL Boom |
| 1 | Air Filter Housing (Quincy #2013400453) for Control Air Filters |
| 3 | Air Oil Separator Quincy 2013402021 |
| | |
| | |
| 1 | T Gen coupling |
| 6 | 8" 8 Bolt hole weld flanges |
| 4 | 3 5/16 drive sockets #5&6 Conveyors |
| 1 | Tail shaft - take up BRNG (Ram) |
| 3 | 45T 2 5/16 Driven Sprockets |
| 2 | #9 Drive Lobes (Head shaft) |
| 1 | 30T #160 Driven Ram Sprocket |
| 1 | Hopper Door BRNG |
| 1 | 8" Weld 45 degree EL |
| 1 | 8" Weld 90 degree EL |
| | **Plumbing** |
| 1 | 2" x .75" Bushing |
| 1 | 2" x 1.25" Bushing |
| 1 | 2" x 1.5" Bushing |
| 1 | 2" Plug |
| 1 | 2" 90 degree elbow |
| 1 | 2" 45 degree elbow |
| 1 | 2" Union |
| 1 | 2" coupling |
| 1 | 2" close nip |
| 1 | 2" x 3" close nip |
| 1 | 2" x 3.5" close nip |
| 1 | 2" x 4" close nip |
| 1 | 2" x 4.5" close nip |
| 1 | 2" x 5" close nip |
| 1 | 2" x 5.5" close nip |
| 1 | 2" x 6" close nip |

| | |
|---|---|
| 1 | 2" Tee |
| 1 | 1.5" x .75" Bushing |
| 1 | 1.5" x 1" bushing |
| 1 | 1.5" x 1.25" bushing |
| 1 | 1.5" plug |
| 1 | 1.5" tee |
| 1 | 1.5" 90 degree elbow |
| 1 | 1.5" 45 degree elbow |
| 1 | 1.5" union |
| 1 | 1.5" coupling |
| 1 | 1.5" close nip |

**Stainless Fittings - Gray Connex Box**

| | |
|---|---|
| 3 | 1.5" threaded 90 degree elbow |
| 8 | 2" weld 90 degree elbow |
| 1 | 2" weld 45 degree elbow |
| 6 | 1.5" weld 90 degree elbow |
| 1 | 1.5" threaded tee |
| 1 | 1.5" threaded coupling |
| 11 | .75" threaded unions |
| 10 | .5" threaded unions |
| 2 | 2"x3" weld reduceer |
| 1 | 1"x3" weld reducer |
| 2 | 1" threaded 90 degree elbow |
| 5 | 1" threaded 45 degree elbow |
| 1 | 1" threaded tee |
| 4 | 3" weld 45 degree elbow |
| 3 | 2.5" weld 90 degree elbow |

| | |
|---|---|
| 5 | 3" threaded 90 degree elbow |
| 3 | 3"x3"x1" weld tee |
| 3 | 2" weld tee |
| 2 | 3" threaded gate values (no pressure rating) |
| 3 | 3" 150psi weld flanges |
| 1 | 1.5" 150psi threaded flange |
| 3 | .5" 300psi weld flange |
| 1 | 3" check valve - 200psi |

**Steel Fittings - Gray Connex Box**

| | |
|---|---|
| 1 | 2.5" threaded flange 8 bolt |
| 1 | 2.5" threaded flange 4 bolt |
| 2 | 2.5" weld flange 4 bolt |
| 1 | 2.5"x8" threaded nip |
| 1 | 2.5"x6" threaded nip |
| 2 | 2.5"x4" threaded nip |
| 1 | 2.5"x5" threaded nip |
| 1 | 2.5"x3" threaded nip |
| 1 | 6"x8" weld adaptor |
| 2 | 8" weld 90 degree elbow |
| 1 | 2" weld gate valve 600psi |
| 1 | 2" weld gate valve 1975psi@100 degrees F |
| 1 | 1" weld globe valve 1975psi@100 degrees F |
| 1 | .75" weld gate valve 1975psi@100 degrees F |
| 1 | 1" weld gate valve 1975psi@100 degrees F |
| 1 | 1" weld bonnet valve 1375psi@100 degrees F |
| 2 | Pigtails 3/8" NPT pressure gauge protected |
| 3 | 6" riser clamps |

| | |
|---|---|
| 3 | 6" pipe hangers |
| 8 | 3" u-bolts; .5" diamter stem thread |
| 12 | 2" u-bolts; 5/16" diameter stem thread |
| 1 | 1.5" gate valve bronze 200 cwp |
| 2 | 1" gate valve bronze 1000 cwp |
| 15 | 1.25" threaded coupling |
| 10 | 1.25" threaded 90 degree elbow |
| 3 | 1.5" threaded 45 degree coupling |
| 5 | 1.25" threaded tee |
| 6 | 2" weld 90 degree elbow |
| 2 | 2"x3" weld adapter |
| 5 | 1" weld coupling |
| 5 | .75" weld coupling |
| 10 | .5" weld coupling |
| 2 | 1" weld 90 degree elbow |
| 3 | 1.25" weld coupling |
| 5 | 2" weld tee |
| 2 | 2" weld 4 way |
| 4 | 4" weld 90 degree elbow |
| 1 | 3" weld 90 degree elbow |
| 1 | 4.5" weld flange |
| 1 | 4.5" weld 90 degree elbow |
| 5 | 1" weld 90 degree elbow |
| 3 | 2.5" threaded 90 degree elbow |
| 1 | 2"x2.5" threaded 90 degree elbow |
| 2 | 2.5" threaded unions |
| 7 | 1.25"x6" threaded nips |

| | |
|---|---|
| 3 | 1.25"x5.5" threaded nips |

**Red Connex Box**

| | |
|---|---|
| 59 | 6' tube shields |
| 26 | Hearth pipes for push rods |
| 1 | Wet scrub pump and motor assembly |
| 30 | Chain w/S22 for #5 6&8 conveyors |
| 3 | 50lbs pails compro set mortar |
| 1 | ESP Transformer |
| 3 | 4" gate valves 300psi |
| 2 | 3" gate valves 300psi |
| 1 | 3" metering valve 150psi |
| 2 | Drag chain sprockets #9 conveyor |
| 8 | 6" weld flanges |
| 6 | Boxes Absorb SOX = 5" Diaxio 4 per box |
| 4 | 5" 90 degree elbow |
| 4 | 5" 45 degree elbow |
| 6 | Used feedwater regulator |
| 1 | 3/8" gate valve 1975psi@100 degrees F |
| 3 | .75" gate valve 1975psi@100 degrees F |
| 5 | 1" gate valve 1975psi@100 degrees F |
| 2 | .5" gate valve 1975psi@100 degrees F |
| 3 | 1.5" gate valve 2000psi@100 degrees F |
| 1 | 2" globe valve 1975psi@100 degrees F |
| 2 | 3" PVC butterfly hayward - new |
| 2 | 3" PVC butterfly asahi - used |
| 2 | 2" diaphragm valve plastic 150psi |
| 1 | 1.5" diaphragm valve plastic 150psi |

| | |
|---|---|
| 2 | 2" gate valve plastic 235psi@73 degrees F |
| 2 | 4" elbows plastic |
| 1 | 4" tee plastic |
| 1 | 3" tee plastic |
| 4 | 12' lengths boiler tube |
| 1 | 30"x24" electric cabinet - new |
| 1 | 28"x28" general purpose cabinet - new |

| Quantity | Horsepower | Voltage | Amps | RPM | Frame | Location | Equipment |
|---|---|---|---|---|---|---|---|
| 1 | 100 | | | | | Pittsfield | Feedwater Pump Motor |
| 1 | 1.5 | | | | | Pittsfield | Back Crane Bridge Motor |
| 1 | 5 | | | | | Pittsfield | Roof Fans Motor |
| 1 | 0.5 | | | | | Pittsfield | Electric Motor |
| 2 | 30 | | | | | Pittsfield | Hydraulic Pump Motor |
| 1 | 1 | | | | | Pittsfield | Hydraulic Cooling Pump Motor |
| 1 | 5 | | | | | Pittsfield | Electric Motor |
| 1 | 5 | | | | | Pittsfield | Drag Chain Motor #8 |
| 1 | 2 | | | | | Pittsfield | Screw Conveyor ESP #1 A+A |
| 1 | 3 | | | | | Pittsfield | Screw Conveyor ESP #2 B+B |
| 1 | 1.5 | | | | | Pittsfield | Parallel Drag Chain Conveyor #5 |
| 2 | 0.25 | | | | | Pittsfield | Plattco Valve Motor |
| 1 | 1 | | | | | Pittsfield | Electric Motor |
| 1 | 0.5 | | | | | Pittsfield | Electric Motor |
| 2 | 2 | | | | | Pittsfield | Fuel Pump Motor |
| 1 | 10 | | | | | Pittsfield | Main Conveyor #9 |
| 2 | 1 | | | | | Pittsfield | Carbon Injection Motor |
| 2 | 200 | | | | | Pittsfield | ID Fans Motor |
| 1 | 150 | | | | | Pittsfield | RFG Fans Motor |
| 1 | 30 | | | | | Pittsfield | Under Fire Air Motor |
| 1 | 1 | | | | | Pittsfield | Portec Soda Ash Pumps |
| 1 | 15 | | | | | Pittsfield | Recirculation Pump Motor |
| 1 | 5 | | | | | Pittsfield | Pug Mill |
| 1 | 1 | | | | | Pittsfield | Lime Hopper Motor |
| 1 | 1 | | | | | Pittsfield | Fly Ash Hopper Motor |
| 1 | 1 | | | | | Pittsfield | Reactor Mixing Motor |
| 1 | 3 | | | | | Pittsfield | Electric Motor |
| 1 | 2 | | | | | Pittsfield | Sewer Sump Tank |
| 2 | | | | | | Pittsfield | Plattco Vibrator for Multiclones |
| 1 | | | | | | Pittsfield | ESP Vibrator |
| 1 | | | | | | Pittsfield | Portec Vibrator |

## SCHEDULE 3

## GOVERNMENTAL CONSENTS, APPROVALS OR AUTHORIZATIONS

- Massachusetts Department of Environmental Protection, Authorization to Operate.

- City of Pittsfield Sewer Discharge Permit, DPU #98040101.

- City of Pittsfield Solid Waste Facility Site Assignment Permit.

- BWP SW 40 - Beneficial Use Determination, Processed Bottom Ash, Transmittal No. W119501, 07-236-007 (issued by MassDEP April 13, 2007).

## SCHEDULE 4

## NOTICE OF ENVIRONMENTAL LAW VIOLATIONS

- June 16, 2021, MassDEP issued Administrative Consent Order with Penalty and Notice of Noncompliance, Enforcement Document Number 00010839.

- On June 17, 2020, MassDEP emailed a Request for Information letter to Community Eco Pittsfield, LLC.

- On August 19, 2020, MassDEP issued a Notice of Noncompliance (NON, Enforcement #00010010) to the Respondent for violations related to fugitive emissions from the Facility.

- On December 22, 2021, MassDEP filed its Proof of Claim [Claim 21], enclosing, among other things, Enforcement Document Number 00010824.  The MassDEP Proof of Claim is incorporated herein by reference.

- March 2022 air monitoring test results and analysis from MassDEP.

## **SCHEDULE 5**

## **PROCEEDINGS PENDING OR THREATENED AGAINST SELLER UNDER ENVIRONMENTAL LAWS**

See Schedule 4, which is incorporated herein by reference.

# EXHIBIT A

## DESCRIPTION OF LAND

The land in Pittsfield, Massachusetts bounded and described as follows:

Beginning at an iron pipe in the northeasterly line of Hubbard Avenue at a point which is N 57° 56' 00" West 110.00 feet along said northeasterly line of Hubbard Avenue from a City highway bound set opposite station 61+10.87 as shown on a 1965 layout of said Hubbard Avenue by the City of Pittsfield, which layout is on file at the offices of the City of Pittsfield Department of Public Works:

Thence N 57° 56' 00" West 220.29 feet along said northeasterly line of Hubbard Avenue to a highway marker bound set;

Thence turning easterly and continuing along said northeasterly line of Hubbard Avenue, as the same forms a curve having a radius of 510.00 feet, 253.21 feet to an iron pipe set;

Thence turning and running N 81° 04' 00" East and along the line of land of one Kelly, now or formerly, 179.99 feet to an iron pipe set at a corner of said Kelly land;

Thence N 8° 56' 00" West and also along a line of land of said Kelly, now or formerly, 180.00 feet to an iron pipe set;

Thence N 85° 52' 00" East along other land now or formerly of Crane & Co., Inc., 500.00 feet to an iron pipe set;

Thence S 4° 33' 20" East along other land now or formerly of Crane & Co., Inc. 440.00 feet to the iron pipe set;

Thence S 72° 37' 10" West along other land now or formerly of Crane & Co., Inc. 339.13 feet to the iron pipe set at the point of beginning.

Together with an easement from Crane & Co. Inc. recorded with the Berkshire Middle District Registry of Deeds in Book 1451, Page 85.

Together with the benefit of the rights and easements in Easement Agreement recorded in Book 5402, Page 98.

## EXHIBIT B

## QUITCLAIM DEED

## QUITCLAIM DEED

*500 Hubbard Avenue, Pittsfield, Massachusetts*

Community Eco Pittsfield, LLC, a New York limited liability company (successor in interest to Covanta Pittsfield, LLC, successor in interest to eco/Pittsfield LLC)  having a usual place of business at [_____ ("**Seller**") grants to [Casella Waste Management of Massachusetts, Inc., a Massachusetts corporation ("**Purchaser**")] having an address 25 Green Hills Lane, Rutland, Vermont 05701, for consideration paid of _____ Dollars ($_____), with *quitclaim covenants*,

A certain parcel of land situated in Pittsfield in the County of Berkshire, Commonwealth of Massachusetts, more particularly described as follows:

Beginning at an iron pipe in the northeasterly line of Hubbard Avenue at a point which is N 57° 56' 00" West 110.00 feet along said northeasterly line of Hubbard Avenue from a City highway bound set opposite station 61+10.87 as shown on a 1965 layout of said Hubbard Avenue by the City of Pittsfield, which layout is on file at the offices of the City of Pittsfield Department of Public Works;

Thence N 57° 56' 00" West 220.29 feet along said northeasterly line of Hubbard Avenue to a highway marker bound set;

Thence turning easterly and continuing along said northeasterly line of Hubbard Avenue, as the same forms a curve having a radius of 510.00 feet, 253.21 feet to an iron pipe set;

Thence turning and running N 81° 04' 00" East and along the line of land of one Kelly, now or formerly, 179.99 feet to an iron pipe set at a corner of said Kelly land;

Thence N 8° 56' 00" West and also along a line of land of said Kelly, now or formerly, 180.00 feet to an iron pipe set;

Thence N 85° 52' 00" East along other land now or formerly of Crane & Co., Inc., 500.00 feet to an iron pipe set;

Thence S 4° 33' 20" East along other land now or formerly of Crane & Co., Inc. 440.00 feet to the iron pipe set;

Thence S 72° 37' 10" West along other land now or formerly of Crane & Co., Inc. 339.13 feet to the iron pipe set at the point of beginning.

Together with all improvements thereon and the benefit of the easements and appurtenances of record benefiting such land and improvements, including without limitation the easements set forth in the following instruments:

    1. Easement Agreement by and between Crane & Co., Inc. and Pittsfield Investors Limited Partnership recorded in the Berkshire Middle District Registry of Deeds in Book 1451, Page 85.

2. Easement Agreement Relating to Steam Lines and Steam Service recorded in the Berkshire Middle District Registry of Deeds in Book 5402, Page 98.

The property described herein is conveyed subject to and with the benefit of all easements, covenants, conditions, rights, takings, rights of way, agreements, restrictions and reservations of record insofar as the same are now in force and applicable and to real estate taxes and other municipal liens not yet due and payable.

For title reference, see deed dated February 16, 2005 recorded in the Berkshire Middle District Registry of Deeds in Book 3164, Page 39.

This conveyance is made subject to the following restriction, which shall remain in force and effect until January 1, 2077:  No well shall be driven, drilled, dug or maintained on the above described premises without the written permission of Crane & Co., Inc., is successors or assigns, having been first obtained.

Executed as a sealed instrument this _____ day of _____, 2022.


COMMUNITY ECO PITTSFIELD, LLC


By:_____
Name:  Richard Fish
Title:  Chief Executive Officer

STATE OF _____

_____ County, ss.


On this ___ day of _____, 2022, before me, the undersigned notary public, personally appeared the above named _____, proved to me through satisfactory evidence of identification, which was [_] photographic identification with signature issued by a federal or state governmental agency or [_] personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose as Chief Executive Office of Community Eco Pittsfield, LLC

_____
Notary Public:
My commission expires:

## EXHIBIT C

## QUITCLAIM BILL OF SALE

## Bill of Sale and General Assignment

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Bill of Sale") is made as of this _____ day of May, 2022 by Community Eco Pittsfield, LLC, a New York limited liability company ("Seller") to Casella Waste Management of Massachusetts, Inc., a Massachusetts corporation ("Buyer").

## RECITALS

**A.**     Seller is the owner of that certain real property located at 500 Hubbard Avenue, Pittsfield, Massachusetts (the "Real Property"), as more particularly described on Exhibit A attached hereto and incorporated herein by reference.

**B.**     Buyer and Seller have entered into that certain Asset Purchase Agreement dated as of _____, 2022 (the "Purchase Agreement"), with respect to, among other things, the acquisition of the Personal Property and certain other property.

**C.**     The Purchase Agreement requires Seller to convey all of Seller's right, title and interest in, to and under the Personal Property to Buyer.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby agrees as follows:

1.     Unless the context otherwise requires, all capitalized terms used but not otherwise defined herein shall have the respective meanings provided therefor in the Purchase Agreement.

2.     Seller does hereby unconditionally, absolutely, and irrevocably grant, bargain, sell, transfer, assign, convey, set over and deliver unto Buyer all of Seller's right, title and interest in and to any and all personal property, including, without limitation, any equipment and furniture, of any kind or nature owned by Seller, including, without limitation, the Intangible Property, and excepting only Licenses and Permits and Excluded Assets (the "Personal Property").

3.     Seller grants, bargains, sells, transfers, assigns, conveys, sets over and delivers the Personal Property to Buyer on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free and clear of any Encumbrances, rights and interests, including any and all express and implied warranties of any kind or nature, except as specifically set forth in the Purchase Agreement, and as approved for sale, transfer and assignment pursuant and subject to the Sale Order.

4.     This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

5.     This Bill of Sale and the legal relations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without regard to its principles of conflicts of law.

IN WITNESS WHEREOF, Seller has hereto executed this Agreement as of the date set forth above.

COMMUNITY ECO PITTSFIELD, LLC

By:_____
Name:  Richard Fish
Title:  Chief Executive Officer

## EXHIBIT A TO BILL OF SALE

### Legal Description of Land

The land in Pittsfield, Massachusetts bounded and described as follows:

Beginning at an iron pipe in the northeasterly line of Hubbard Avenue at a point which is N 57° 56' 00" West 110.00 feet along said northeasterly line of Hubbard Avenue from a City highway bound set opposite station 61+10.87 as shown on a 1965 layout of said Hubbard Avenue by the City of Pittsfield, which layout is on file at the offices of the City of Pittsfield Department of Public Works:

Thence N 57° 56' 00" West 220.29 feet along said northeasterly line of Hubbard Avenue to a highway marker bound set;

Thence turning easterly and continuing along said northeasterly line of Hubbard Avenue, as the same forms a curve having a radius of 510.00 feet, 253.21 feet to an iron pipe set;

Thence turning and running N 81° 04' 00" East and along the line of land of one Kelly, now or formerly, 179.99 feet to an iron pipe set at a corner of said Kelly land;

Thence N 8° 56' 00" West and also along a line of land of said Kelly, now or formerly, 180.00 feet to an iron pipe set;

Thence N 85° 52' 00" East along other land now or formerly of Crane & Co., Inc., 500.00 feet to an iron pipe set;

Thence S 4° 33' 20" East along other land now or formerly of Crane & Co., Inc. 440.00 feet to the iron pipe set;

Thence S 72° 37' 10" West along other land now or formerly of Crane & Co., Inc. 339.13 feet to the iron pipe set at the point of beginning.

Together with an easement from Crane & Co. Inc. recorded with the Berkshire Middle District Registry of Deeds in Book 1451, Page 85.

Together with the benefit of the rights and easements in Easement Agreement recorded in Book 5402, Page 98.

## EXHIBIT D

## RELEASE

This RELEASE (the "Release") is entered into and granted as of this ____ day of _____, 2022, by Community Eco Pittsfield, LLC, ("Seller"), Community Eco Power, LLC ("CEP LLC"), and Community Eco Springfield, LLC ("CEP Springfield", and, collectively with Seller and CEP LLC, the "Releasors"), in favor the Releasees (as defined below).

WHEREAS, Seller and Casella Waste Management of Massachusetts, Inc., a Massachusetts corporation ("Purchaser") have identified certain assets that Purchaser desires to purchase from the Seller (the "Purchased Assets") pursuant to that certain Asset Purchase Agreement dated ____, 2022 (the "Asset Purchase Agreement");

WHEREAS pursuant to Section 8.4(a)(iii) of the Asset Purchase Agreement, it is a closing obligation of the Releasors to release certain claims against Purchaser and, its affiliate, Casella Waste Systems, Inc. (collectively referred to herein as the "Releasees");

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, each of the Releasors hereby agrees as follows:

1.    General Release by Releasors. Each of the Releasors and their estates hereby releases and forever discharges each and all of the Releasees from any and all actions, suits, claims and demands, whether known or unknown, arising under Chapter 5 of the Bankruptcy Code.

2.    Choice of Law.  This Release shall be construed, interpreted and the rights of the Parties determined in accordance with the Laws of the Commonwealth of Massachusetts, without regard to conflicts of law principles thereof, except with respect to matters of Law concerning the internal corporate affairs of any corporation, company or limited liability company that is a party to or the subject of this Release, and as to those matters the Law of the jurisdiction of incorporation or organization of such entity shall govern.

*[Signature pages to follow]*

COMMUNITY ECO PITTSFIELD, LLC


By:_____
Name:  Richard Fish
Title:  Chief Executive Officer




COMMUNITY ECO POWER, LLC



By:_____
Name:  Richard Fish
Title:  Chief Executive Officer




COMMUNITY ECO SPRINGFIELD, LLC



By:_____
Name:  Richard Fish
Title:  Chief Executive Officer

## EXHIBIT E

### Form of FIRPTA Affidavit

Section 1445 of the Internal Revenue Code provides that a transferee (or buyer) of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. In order to inform [                    ], and its nominees, designees and assigns (collectively, "Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by [                 ] ("Transferor"), the undersigned being duly authorized hereby certifies the following on behalf of Transferor:

Transferor is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

Transferor is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Income Tax Regulations;

Transferor's federal taxpayer identification number is _____; and

Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

*[Remainder of page intentionally left blank.  Signature page follows.]*

Under penalties of perjury, the undersigned declares that he/she has examined this certification, and it is true, correct, and complete, and he/she further declares that he/she has the authority to sign this certification on behalf of Transferor.

Date: _____, 2022

[                                    ]

By: _____

Name:

Title:

[INSERT NOTARY BLOCK]

## **<u>EXHIBIT F</u>**

**TEMPORARY OPERATING, TRANSPORTATION & DISPOSAL AGREEMENT**

## TEMPORARY OPERATING, TRANSPORTATION & DISPOSAL AGREEMENT

THIS TEMPORARY OPERATING, TRANSPORTATION & DISPOSAL AGREEMENT (this "Agreement") effective as of May 2, 2022 (the "Effective Date"), between Community Eco Pittsfield, LLC, a New York limited liability company ("CEP") and Casella Waste Management of Massachusetts, Inc., a Massachusetts corporation ("Subcontractor" and, together with CEP, the "Parties").

## RECITALS

CEP owns certain real estate and improvements, a sketch of which is set forth on the attached **EXHIBIT A** (the "Real Property"), and certain personal property and holds various permits and licenses relating to operating a waste-to-energy facility and construction and demolition debris (C&D)/recyclables and solid waste transfer operation located at 500 Hubbard Avenue, Pittsfield, Massachusetts (the "Facility"), including, without limitation, the Authorization to Operate including any revisions authorized by MassDEP during the Term (the "Main Permit").  The portion of the Real Property highlighted in green on **EXHIBIT A** is referred to in this Agreement as the "Access Area."

On June 25, 2021, CEP filed a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (Western Division) (the "Bankruptcy Court") filed under lead Case No. 21-30234, which Chapter 11 Case is being jointly administered for procedural purposes only with the chapter 11 cases of Community Eco Power, LLC and Community Eco Springfield, LLC.

On the Effective Date, in accordance with the Sale Order, CEP and Subcontractor are entering into a certain Asset Purchase Agreement (the "Purchase Agreement").  Capitalized terms used in this Agreement without other definition and which are defined in the Purchase Agreement are used in this Agreement with the meanings ascribed to them in the Purchase Agreement.

To the extent required by the MassDEP, the CEP Closure Process will require the Parties to ultimately dispose of the municipal solid waste ("MSW") located at the Facility, by incurring the cost of transferring and transporting it for lawful disposal at other waste to energy facilities or landfills, with the costs of such transfer, transportation and disposal included among the Closure Costs.

The Parties are entering into this Agreement to provide a means of facilitating the Parties efforts to carry out the CEP Closure Process by:  (a) providing a means to address MSW received at the Facility during the term of this Agreement ("New MSW") without cost to CEP or disruption to the municipalities or other parties that deliver MSW to the Facility (the "Delivery Parties"); and (b) enabling CEP to continue to operate the Facility short term to remove MSW onsite at the Facility at the opening of business on the Effective Date ("Old MSW") to the extent allowed by MassDEP and without cost to CEP.

THEREFORE, in consideration of the mutual benefits to be derived from this Agreement and of the agreements and promises contained herein and for other good and valuable consideration, the Parties hereby agree as follows:

-47-

1.      **Term**.  This Agreement shall commence on the Effective Date and shall continue in full force and effect until the first to occur of:  (a) completion of the Closing; (b) the termination of the Purchase Agreement; or (c) notice from MassDEP to the Parties that the arrangement contemplated by this Agreement is not, in the opinion of MassDEP, lawful (the period during which this Agreement continues in effect is referred to in this Agreement as the "Term").

2.      **Continued Operation of the Facility**.  During the Term, CEP may continue to operate the Facility in accordance with the Main Permit, other applicable permits and applicable law with respect to the Old MSW.  During the Term, CEP may accept New MSW for transfer at and transportation from the Facility in accordance with the terms of this Agreement.

3.      **Old and New MSW**.

        (a)      During the Term, Subcontractor shall be responsible for receiving all New MSW at the Facility and transferring and transporting the same for ultimate lawful disposal other than at the Facility.  The Parties agree that Subcontractor shall be entitled to carry out the same under the terms of the Main Permit.  The Parties acknowledge that the Main Permit is issued to CEP, and CEP retains all liabilities under the Main Permit and any other applicable permit during the Term.  Promptly following execution and delivery of this Agreement, CEP shall deliver the Notice attached as **EXHIBIT B** to MassDEP.  Subcontractor's activities under this Agreement shall all be for the sole account, and all at the sole cost, of Subcontractor, and Subcontractor shall be solely responsible for billing and collecting from the Delivery Parties with respect to all New MSW during the Term, including, without limitation, that Subcontractor shall be solely responsible for the difference under the City of Pittsfield disposable services agreement between the amount the City of Pittsfield pays per ton and Subcontractor's cost for transferring and transporting the same, which such difference is estimated at $40.00/ton.

        (b)      During the Term, Subcontractor shall be responsible for the cost of removing, transferring, and transporting all Old MSW, which such costs shall include, without limitation, the cost for removing Old MSW from the "pit" located at the Facility on or before May 9, 2022, which such cost is estimated at $58,000.00.

4.      **Access**.  During the Term, CEP shall permit Subcontractor and its designated personnel full access to the Access Area for purposes of carrying out Subcontractor's obligations set forth in **Section 3** and matters incidental thereto (e.g., parking for Subcontractor's employees).  This access shall include access to the scalehouse and the area labeled "Transfer Area" on **EXHIBIT A** and shared access to the office located in the Access Area, as well as use of the scalehouse and other personal property located therein for purposes of carrying out scalehouse functions, as well as providing appropriate documentation of delivery and billing to the Delivery Parties.  Subcontractor shall hold CEP harmless from any damage to the Access Area or the personal property referenced above resulting from Subcontractor's use thereof and for any damages arising out of Subcontractor's access to and use of the Facility and shall provide CEP with evidence of insurance satisfactory to CEP providing coverage for the types of activities to be conducted hereunder, which evidence of insurance shall be provided in advance of commencement of the Term.

5.      **Support Services**.  During the Term, to assist Subcontractor in carrying out its duties under **Section 3**, and to facilitate the transition CEP Closure Process, CEP shall provide employees to

perform the following services to Subcontractor (respectively, the "<u>Employees</u>" and the "<u>Services</u>"): (i) lead operator/supervisor; (ii) second equipment operator; (iii) laborer with equipment operation familiarity; and (iv) a scale operator as set forth in **<u>EXHIBIT C</u>**.  CEP shall ensure that the Employees are available on a full-time basis sufficient to perform Subcontractor's obligations under the Agreement.  Nothing herein shall create any employment, agency, or other legal obligation or relationship between Subcontractor and Employees.  CEP shall pay the Employees directly for the Services (such payments are referred to herein as the "<u>Employee Obligations</u>"), and Subcontractor shall be responsible for reimbursing CEP for all of the Employee Obligations.  CEP shall invoice Subcontractor for reimbursement of the Employee Obligations on a weekly basis, and Subcontractor shall remit payment to CEP within seven (7) days of receipt of each invoice.

**<u>6</u>**.      **<u>Equipment</u>**.  During the Term, to assist Subcontractor in carrying out its duties under **Section 3**, and to facilitate the transition CEP Closure Process, CEP shall grant Subcontractor use of the designated equipment as set forth in **<u>EXHIBIT C</u>** (the "<u>Equipment</u>").  Subcontractor shall reimburse CEP for use of the Equipment upon the rates and terms set forth in **EXHIBIT C**.

**7.**      **<u>Integration; Priority</u>**.  This Agreement and the Sale Order together contain the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements or understandings between the Parties related to such subject matter.  In the event of any conflict between any provision of this Agreement and the Sale Order, the terms of the Sale Order shall govern.

**8.**      **<u>Purchase Agreement Provisions</u>**.  Sections 10.5, 10.6, 10.7, 10.8, 10.10, 10.11, 10.12, 10.13, 10.14, 10.15, 10.16, and 10.17 of the Purchase Agreement are incorporated into this Agreement by this reference, and shall have the same force and effect in and with respect to this Agreement as if set forth in full.

[Signature page follows.]

-49-

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

COMMUNITY ECO PITTSFIELD, LLC

By: _Richard Fish_____
Name:  Richard Fish
Title:  Chief Executive Officer

CASELLA WASTE MANAGEMENT OF MASSACHUSETTS, INC.

By:_____
Name:
Title:      Manager

-Signature Page to Decommissioning Assistance Agreement-

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

COMMUNITY ECO PITTSFIELD, LLC

By:_____
Name:  Richard Fish
Title:  Chief Executive Officer

CASELLA WASTE MANAGEMENT OF MASSACHUSETTS, INC.

By:_____
Name:   John W. Casella
Title:    President & Clerk

## **EXHIBIT A**

<u>The Real Property</u>



## **EXHIBIT B**

### Notice to MassDEP

This provides notice that, effective May 2, 2022 (the "<u>Effective Date</u>"), Community Eco Pittsfield, LLC ("<u>CEP</u>") and Casella Waste Management of Massachusetts, Inc. ("<u>Casella</u>" and, together with CEP, the "<u>Parties</u>") have entered into a Temporary Operating, Transportation & Disposal Agreement (the "<u>Agreement</u>") under which:

1. CEP and Casella will work together to ensure uninterrupted solid waste disposal and recycling service to local communities in Pittsfield, MA.

2. CEP will continue to operate the Facility (as defined below) short term to accept municipal solid waste ("<u>MSW</u>") onsite at the Facility at the opening of business on the Effective Date ("<u>Old MSW</u>") to the extent allowed by MassDEP, but will not accept any MSW at the Facility during the term of the Agreement for incineration at the Facility.  During the term of the Agreement, CEP will continue to operate the Facility in accordance with its Authorization to Operate including any revisions authorized by MassDEP during the Term (the "<u>Main Permit</u>"), other applicable permits and applicable law with respect to the Old MSW.

3. Casella will be responsible for MSW received at the Facility during the term of the Agreement ("<u>New MSW</u>") and transferring and transporting the same for ultimate lawful disposal other than at the Facility.

4.  Casella, as CEP's subcontractor under the Agreement, will be entitled to carry out its obligations under the Agreement under the terms of the Main Permit.  The Parties acknowledge that the Main Permit is issued to CEP, and CEP retains all liabilities under the Main Permit and any other applicable permit during the term of the Agreement.

The Agreement will continue in full force and effect until the first to occur of:  (a) completion of the closing of the Asset Purchase Agreement under which Casella would purchase from CEP certain real estate and improvements and certain personal property relating to operating a waste-to-energy facility and construction and demolition debris (C&D)/recyclables and solid waste transfer operation located at 500 Hubbard Avenue, Pittsfield, Massachusetts (the "Facility"); (b) the termination of the Asset Purchase Agreement; or (c) notice from MassDEP to the Parties that the arrangement contemplated by the Agreement is not, in the opinion of MassDEP, lawful.

## **EXHIBIT C**

### Staffing and Equipment Schedule

| Position | Rate/week (salaried) | Rate/hour (hourly) |
|---|---|---|
| Facility Manager | $1,555 | |
| Mechanic/Equipment Operator | | $40.00 |
| Lead Operator | | $34.00 |
| Operator | | $24.25 |
| Scale Operator | | $25.00 |

Notes:
1) 30% markup will be included on all rates above covering benefits, taxes and administrative costs
2) Overtime will be charged at 1.5x Rate/hour for all hours over 40 in a week plus 7.65% markup for taxes

The following equipment currently leased by CEP and can be made available at cost.

I90 Loader            $5,000.00/week